[Cite as *State v. Rodenberger*, 2020-Ohio-6979.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
LUCAS COUNTY

State of Ohio                                    Court of Appeals No. L-19-1163

    Appellee                                  Trial Court No. CR0201901002

v.

Jason Edward Rodenberger                          **DECISION AND JUDGMENT**

    Appellant                                 Decided:  December 30, 2020

* * * * *

Julia R. Bates, Lucas County Prosecuting Attorney, and
Brenda J. Majdalani, Assistant Prosecuting Attorney, for appellee.

Lawrence A. Gold, for appellant.

* * * * *

**MAYLE, J.**

{¶ 1} Appellant, Jason Rodenberger, appeals the July 5, 2019 judgment of the Lucas County Court of Common Pleas following his conviction on one count of rape and one count of sexual battery.  For the following reasons, we affirm the trial court's judgment.

## I. Facts and Procedural Background

{¶ 2} On July 21, 2018, the victim in this case, J.B., went to the hospital alleging that Rodenberger had raped her. A Sexual Assault Nurse Examiner ("SANE") examined her, and J.B.'s allegations were reported to the Lucas County Sheriff's Department.

{¶ 3} On January 2, 2019, Rodenberger was indicted on one count of rape in violation of R.C. 2907.02(A)(1)(c) and (B), a first-degree felony; one count of sexual battery in violation of R.C. 2907.03(A)(2), a third-degree felony; and one count of sexual battery in violation of R.C. 2907.03(A)(3) and (B), a third-degree felony. Rodenberger was arraigned on January 22, 2019, and entered a not guilty plea to all three counts. On June 11, 2019, a three-day trial commenced.

### A. The State's Case-in-Chief

{¶ 4} In its case-in-chief, the state elicited the following witness testimony:

### J.B.

{¶ 5} J.B. testified that on the evening of July 20, 2018, she traveled to the Bluegrass Campground located in Lucas County, Ohio. She was familiar with the campground as both her mother and her brother had campsites at that location. J.B. arrived at approximately 5:00 p.m. and went to Rodenberger's brother's campsite and began to consume alcoholic beverages. From the time she arrived until approximately 9:00 p.m., J.B. consumed four beers. Rodenberger and his girlfriend arrived at the campsite during this time.

2.

{¶ 6} J.B. originally planned to go to a comedy club that night with her then-boyfriend, B.M. However, B.M. arrived too late to attend the comedy show. Instead, J.B., her boyfriend, Rodenberger, and Rodenberger's girlfriend decided to play pool at the campground's pool hall. J.B. continued to consume alcohol while at the pool hall. The group departed the clubhouse at approximately 11:30 p.m. and returned to Rodenberger's brother's camper.

{¶ 7} A short time later, J.B. began feeling tired. She and B.M. walked to his camper so that she could go to sleep. J.B. did not stumble while she was walking to B.M.'s trailer. B.M. prepared a bed for her sometime between midnight and 1:00 a.m. on July 21, 2018. Once J.B. was in bed, B.M. left and returned to join the others in their party. J.B. testified that she "passed out" wearing a hooded sweatshirt, pants, and underwear. She was alone in the camper at the time. She described her alcohol consumption throughout the course of the evening as "10, 11 beers. I don't know. A lot." She estimated her intoxication level as an 8 out of 10.

{¶ 8} At approximately 4:00 a.m., J.B. awoke to find Rodenberger on top of her with his hand over her mouth. J.B. was no longer clothed and Rodenberger was having vaginal intercourse with her. Rodenberger told J.B. to be quiet because his girlfriend was asleep in the camper. J.B. testified that she never consented to sex with Rodenberger.

{¶ 9} J.B. immediately jumped to her feet, dressed, and ran to her car. Realizing that she was too intoxicated to drive, she drove to the campground's front desk to call a friend to pick her up. She reached her friend, A.M., and asked him to pick her up. A.M.

3.

was unable to pick her up immediately so J.B. decided to drive home despite her intoxication. A.M. later met J.B. at her residence, where J.B. told him that she had been raped. J.B. then took a shower. A.M. stayed with J.B. until she fell asleep.

{¶ 10} After J.B. woke up, her mother took her to the hospital. J.B. testified that she told the nurse conducting her exam about the circumstances of the incident. J.B. stated that she also spoke with Lucas County Sheriff's Department Detective Jeffrey Kozak while at the hospital to provide him with her version of events for his investigation.

{¶ 11} On cross-examination, J.B. acknowledged that she informed Detective Kozak that she estimated her intoxication as a 5 out of 10. She also testified that approximately 11 hours had elapsed between the time that she began drinking alcohol to when she ran from B.M.'s trailer.

### Testimony of A.M.

{¶ 12} A.M. testified that he had known J.B. for approximately two years prior to the incident. On the morning of July 21, 2018, at some time between 4:00 and 5:00 a.m., A.M. received a phone call from J.B. She was "extremely upset," crying, and "hysterical." She asked him to come and pick her up immediately saying she needed to "get out of [there]." When A.M. asked her specifically what had happened, she responded that she needed to leave and was in her car driving home. A.M. again asked her what happened and she said she had been raped.

4.

{¶ 13} A.M. went to meet J.B. at her residence. When he arrived she was crying and shaking. A.M. testified that he had never seen J.B. crying or shaking before. A.M. suggested that they call the police but J.B. declined. J.B. asked A.M. to stay with her until she fell asleep. A.M. agreed and remained with her until she woke up later that morning. He then left J.B. in her mother's care and returned to his home.

**Testimony of Jennifer Bauman, R.N.**

{¶ 14} Jennifer Bauman, R.N., is the SANE that examined J.B. on July 21, 2018. She was qualified, without objection, as an expert witness in nursing and sexual assault examination and permitted to testify in that capacity. Baumann described J.B.'s demeanor during her exam as "quiet" and "guarded." During the course of her examination, Bauman conducted an interview with J.B. Bauman utilized her notes from that exam during her testimony to describe the details J.B. provided to her.

{¶ 15} J.B. stated that she spent the evening socializing with friends while drinking alcohol and playing pool, and that she went to bed around 1:30 a.m. J.B. did not tell Bauman how much alcohol she had consumed or whether or not she was intoxicated. She awoke around 4:00 a.m. to find Rodenberger having sex with her. As she awoke, she believed it to be B.M. but then realized that it was appellant. Upon this realization, she immediately left. J.B. informed Bauman that Rodenberger did not "touch [her] anywhere or do anything else to [her]."

{¶ 16} Bauman then performed a physical exam. J.B.'s vaginal cavity showed no signs of physical injury. Bauman testified that this was not an uncommon finding in

SANE examinations when the victim was sexually active. This also did not surprise Bauman as J.B. had been drinking alcohol and was asleep at the time of intercourse. As a result, the incident was not violent and did not result in physical injuries.

{¶ 17} Bauman also utilized a rape kit to collect physical evidence during her examination. Bauman collected J.B.'s underwear, swabbed them, and placed the swabs and underwear in the rape kit. Bauman also performed multiple vaginal swabs and placed them in the kit. The kit was then sealed, and Bauman contacted the Lucas County Sheriff's Department to report the alleged rape.

{¶ 18} Bauman testified that in her expert opinion, and to a reasonable degree of medical certainty, that her findings were consistent with J.B.'s version of events.

**Testimony of Hallie Dreyer**

{¶ 19} Hallie Dreyer is a forensic scientist in the DNA unit of the Ohio Bureau of Criminal Investigation ("BCI"). She was qualified, without objection, as an expert witness in forensic science and DNA analysis and permitted to testify in that capacity.

{¶ 20} As part of her duties with the BCI, Dreyer reviews evidence related to criminal investigations looking for the presence of biological materials. From those materials, she seeks to generate DNA profiles to compare to known individual's DNA to either confirm or exclude that individual as the contributor of that evidence. Dreyer testified that she performed this process related to the rape kit collected by Bauman and submitted to the BCI by the Lucas County Sheriff's Office.

6.

{¶ 21} The initial DNA analysis was performed by another analyst at the BCI. The swabs from J.B.'s underwear were "not suitable for comparison." Dreyer understood that initial analysis of the vaginal cavity swabs were inconclusive regarding the identity of the male contributor to the DNA mixture collected. Dreyer then performed a "Y-STR DNA" test on the vaginal cavity swabs which focused on analyzing only the DNA in the Y chromosomes found in the collected mixture—thus focusing her investigation on identifying male DNA. From two vaginal cavity swabs analyzed, Dreyer was able to identify Rodenberger, who had previously provided a DNA swab, as a contributor to the male DNA profile mixture collected from J.B. She was also able to exclude B.M. as a DNA contributor by comparing the results to a DNA swab he had provided.

{¶ 22} Dreyer next sought to calculate whether the DNA profile was statistically rare or more common. Dreyer concluded that she would need to test 699 unrelated male individuals to see the same potential profile. From this analysis, Dreyer concluded that, in her expert opinion, Rodenberger was the sole male contributor of DNA to the mixture collected from J.B.

### Testimony of B.M.

{¶ 23} B.M. testified that he has known J.B. for 5 or 6 years. He stated that on January 20, 2018, he was supposed to meet J.B. to attend a comedy show. He was late so they were unable to attend the show. When he arrived at the campground, he joined J.B. and a group of others around a campfire and began consuming alcohol. He stated that

7.

J.B. had a "beer in her hand the whole time." He estimated her intoxication as a 7 to 8 out of 10. He stated that she was intoxicated and would have been unable to drive.

{¶ 24} B.M. stated that J.B. and Rodenberger had interacted socially while the group was playing pool and sitting around the campfire. B.M. eventually walked J.B. from the campfire to his camper when she said she was tired. He set her up in a bed with a blanket and returned to the party. At this time, B.M. was recently separated from his wife. He believed that sleeping in the camper with J.B. would have resulted in unwanted gossip so he asked Rodenberger and his girlfriend to sleep in the camper. He went to sleep in his truck at approximately 1:30 a.m.

{¶ 25} B.M. awoke at 9:00 a.m. He read a text from J.B. which was sent between 3:30 and 3:40 a.m. In that text, J.B. accused Rodenberger of raping her. He attempted to contact J.B. but did not receive a response. He ultimately got ahold of J.B.'s mother who explained that J.B. was upset but was convinced to go to the hospital and have a SANE examination.

{¶ 26} B.M. next called Rodenberger to ask what happened. Rodenberger did not initially divulge any of his interactions with J.B. in the camper. B.M. then mentioned that J.B. was going to the hospital for a SANE exam. Rodenberger then explained that while sleeping in the camper, he heard J.B. having a bad dream. Rodenberger stated that he went to check on J.B. and that when he did, she pulled him in and began having sex with him. B.M. and Rodenberger then argued about Rodenberger's conduct and the phone call ended.

8.

{¶ 27} Since July 21, 2018, B.M. has spoken with Rodenberger on several occasions. They discussed J.B.'s allegations which Rodenberger described as "crazy." Rodenberger also eventually gave him a different version on his story, in which he claimed that J.B. was choking rather than having a nightmare.

## B. Defendant's Case-in-Chief

{¶ 28} In its case-in-chief, the defense elicited the following witness testimony:

### Testimony of Detective Jeffrey Kozak

{¶ 29} Jeffrey Kozak is a detective with the Lucas County Sheriff's Department. Kozak interviewed J.B., B.M., and Rodenberger. He also reviewed physical evidence collected by the SANE nurse and examined by the BCI. Although Officer Mowery took J.B.'s initial statement and prepared an initial report of the Sheriff's Department's investigation, Kozak later prepared a supplemental report. At trial, Kozak recounted his investigation.

{¶ 30} Upon his arrival at the hospital on July 21, 2018, Kozak spoke with the SANE nurse outside of J.B.'s room. The nurse indicated that she was finishing J.B.'s exam, and that he could speak with J.B. after she was done.

{¶ 31} Kozak spoke with J.B. in the presence of the SANE nurse, a victim's advocate, and J.B.'s mother. J.B. provided Kozak with some basic information regarding the events of the prior evening and a list of names of individuals who were present. Kozak stated that J.B. was not volunteering information to him and that it was like "trying to pull teeth from her"—perhaps, he said, because she had already recounted her

9.

story to two other people and his large physical presence may have made her nervous. J.B. indicated that a friend—later revealed to be A.M.—came to her residence after she left the campground. She did not provide Kozak with A.M.'s name and Kozak did not press her to provide the name. He acknowledged that he learned of A.M.'s identity in December 2018, but did not speak to him until the Monday before the trial. In fact, Kozak acknowledged that he only interviewed J.B., B.M., and Rodenberger despite J.B.'s identification of others who may have had knowledge relevant to the investigation. He also did not attempt to corroborate the information J.B. provided to him during their interview to ensure it was the same as the information she provided to Officer Mowery or the SANE nurse.

{¶ 32} Kozak stated that he did not request any blood alcohol concentration testing when he interviewed J.B. at the hospital. In Kozak's view, a rape investigation was warranted because J.B. said she was asleep while Rodenberger was having sex with her.

{¶ 33} After conducting his initial interviews and viewing the BCI evidence, he believed that a crime had occurred. He asked the prosecutor to charge Rodenberger with rape. Once Rodenberger was indicted, Kozak assisted the prosecutor's office with the remaining aspects of the investigation.

### Testimony of T.R.

{¶ 34} T.R. is Rodenberger's brother. He was present at the campground on July 20, 2018 and July 21, 2018. T.R. was at his camper with his two sons before J.B. arrived. He testified that he knew J.B. for approximately one year before the night in

10.

question and considered them to be friends. He testified that on July 20, 2018, J.B. was at her mother's camper when she saw him on his deck and walked over to join him. He stated that J.B. was consuming alcohol, but he observed J.B. walking to the pool hall and she had no trouble walking.

{¶ 35} J.B. returned from shooting pool at approximately 11:30 p.m. At that time, T.R. set up a campfire where the group, including J.B., congregated. He described her condition as "fine." She was not slurring her speech, swaying, or falling asleep. T.R. had previously observed J.B. when she was "really drunk." Based on that, he estimated her intoxication level on that night to be a 5 out of 10. He did not think J.B. had drank heavily that night.

{¶ 36} After about an hour, J.B. stated that she was not feeling well and walked to B.M.'s trailer. J.B. was not stumbling or falling down as she walked. B.M. returned to the campfire after leaving J.B. in his camper. T.R. does not recall if B.M. continued consuming alcohol.

{¶ 37} T.R. first learned of J.B.'s allegations from B.M. when he visited him on July 21, 2018. T.R. testified that B.M. was angry but stated that he did not believe the rape allegation.

{¶ 38} T.R. testified that he also saw J.B. at a community horseshoe pit on Sunday, July 22, 2018. He testified that she was consuming alcohol that day and that she did not seem upset. T.R. also indicated that he did not attempt to speak with the

11.

investigating detective because he did not know that J.B.'s consumption of alcohol was relevant to the allegations against his brother.

## Testimony of M.C.

{¶ 39} M.C. is Rodenberger's girlfriend. They have been dating for a year and one-half at the time of trial and were in a relationship on July 20, 2018 and July 21, 2018. She had not met J.B. prior to that night. She and Rodenberger arrived at T.R.'s camper around 7:00 p.m. Rodenberger introduced M.C. to J.B. and they spent the evening "talking, joking around, having a fun time." M.C. estimates that J.B. consumed 2 or 3 alcoholic beverages while they were at the pool hall.

{¶ 40} Everyone returned to T.R.'s camper around 11:30 p.m. During this time, M.C. did not notice J.B. stumbling, slurring her words, or having trouble staying awake. M.C. testified that around 1:00 a.m. B.M. returned to his camper to make a bed for J.B. He then returned to the party and told J.B. that her bed was ready. M.C. states that J.B. then walked to B.M.'s camper alone and without assistance.

{¶ 41} At around 2:30 a.m., M.C. informed Rodenberger that she was ready to leave. B.M. invited them to stay in his camper, and they accepted. When they entered B.M.'s camper, she saw J.B. asleep. They were in B.M.'s camper for approximately five minutes before they laid down to go to sleep. M.C. recalls being woken up at 4:30 a.m. with Rodenberger telling her it was time to go. She did not wake up at any other point between when she went to sleep and when Rodenberger woke her up. She did not know if J.B. was still in the camper at this time. She and Rodenberger then returned to her

12.

home and went back to sleep.  She did not notice anything unusual about Rodenberger's demeanor during this time.

{¶ 42} At 9:30 a.m., Rodenberger woke M.C. up and told her that he had sex with J.B.  At that time, Rodenberger did not tell M.C. that J.B. was saying that he had raped her.  At 1:00 p.m., Rodenberger informed her of the rape accusation while he was vomiting in the bathroom.

**Testimony of Jason Rodenberger**

{¶ 43} Rodenberger was invited to the Blue Grass Campground on July 20, 2018, by his brother.  He arrived around 6:30 p.m. and was socializing at his brother's camper.  J.B. was present when he arrived.  He had known J.B. for approximately seven years.  Like other witnesses, Rodenberger testified that he, M.C., J.B., and B.M. went to the pool hall during the evening.  He noticed that J.B. was consuming alcohol while they were playing pool.  Rodenberger had seen J.B. intoxicated in the past, and he did not believe that she was intoxicated on the evening of July 20, 2018.

{¶ 44} At 11:30 p.m., Rodenberger and the members of the party left the pool hall and returned to T.R.'s camper.  They then sat around a campfire and continued to drink alcohol.  Rodenberger did not notice J.B. slurring her speech.  Rodenberger remembers seeing J.B. walk to B.M.'s trailer, and he did not notice her stumble or fall.

{¶ 45} B.M. came back to the campfire after dropping off J.B at his camper.  At 1:30 a.m., M.C. told Rodenberger that she was ready to leave.  B.M. encouraged them to

13.

stay at his camper since they had been consuming alcohol and because he wanted to avoid the appearance that he and J.B. were dating. Rodenberger and M.C. agreed to stay.

{¶ 46} Upon entering the camper, Rodenberger went to use the restroom and M.C. went to the bedroom. Rodenberger was not aware if M.C. interacted with J.B. before she entered the bedroom. Rodenberger then went to his truck to get a blanket and returned to the bedroom to join M.C. He tried to move quietly because he knew that J.B. was sleeping. He and M.C. then both fell asleep.

{¶ 47} The next thing Rodenberger remembers is waking up to a "coughing and wrestling noise." He testified that the noise woke M.C. but that she immediately went back to sleep. Rodenberger got up to see what the noise was and saw J.B. "tossing and turning and coughing." He touched J.B. on the shoulder and asked if she was okay. She responded saying "yeah, Jason, I'm fine." J.B. then reached out and grabbed Rodenberger's hand. He asked if she was "sure," meaning did she want to have sex, and she said "yes." J.B. then pulled him down onto her and they started kissing. Rodenberger stated that J.B. then removed her own pants and underwear. He said that J.B. was awake the entire time and that he did not believe she was intoxicated. Rodenberger stated that he felt bad about having sex with J.B. while M.C. slept in the next room but chose to do so anyway.

{¶ 48} Rodenberger stated that J.B. said his name more than once during sex. Rodenberger denies putting his hand over J.B.'s mouth to keep her from awaking M.C. At one point, he stopped and stood up to make sure that M.C. had not woken up. J.B.

14.

then said "you're not [B.M.]" and grabbed her clothes and began getting dressed. She then left through the camper door. Rodenberger followed and when he reached the door he asked her what was wrong. She stated that she thought he was B.M. She then went and got in her vehicle and Rodenberger remained in the camper.

{¶ 49} Rodenberger testified that he felt confused about J.B.'s reaction and felt bad about having cheated on his girlfriend. He decided that he should leave. He woke M.C. and they returned to her house. M.C. went back to sleep and Rodenberger paced around the house before falling asleep.

{¶ 50} He awoke to an incoming Facebook messenger call from B.M. B.M. asked what happened and Rodenberger stated that nothing happened. B.M. told Rodenberger that J.B. had sent him a text saying that Rodenberger had raped her. When M.C. woke up Rodenberger informed her of his conduct and J.B.'s accusation. He says that he felt sick and paced the rest of the day because he was being accused of something that he did not do.

{¶ 51} Rodenberger was later contacted by Detective Kozak. He testified that he provided Kozak with a statement substantially similar to his testimony at trial.

{¶ 52} Throughout his testimony, Rodenberger denied that J.B. was asleep or too intoxicated to consent to having intercourse with him. He testified that she knew who he was when she consented to having intercourse with him.

15.

**Crim.R. 29 Motion, Conviction, and Appeal**

{¶ 53} At the close of the state's case-in-chief and again at the end of trial, Rodenberger made an oral motion for judgment of acquittal pursuant to Crim.R. 29. In support of his motion, Rodenberger alleged that the state failed to present sufficient evidence that he knew that J.B.'s ability to appraise the nature of her own conduct was substantially impaired at the time of their intercourse—a necessary element of Counts 1 and 2. The trial court denied his motion. He renewed the motion at the close of his defense and it was again denied.

{¶ 54} Following deliberation, the jury convicted Rodenberger on Counts 1 and 2 and acquitted him on Count 3. Rodenberger's sentencing occurred on July 5, 2019. At sentencing, the trial court determined that Counts 1 and 2 were allied offenses of similar import. The state elected to have Rodenberger sentenced on Count 1, the rape offense. Rodenberger was ordered to serve a mandatory three-year prison term and was classified as a Tier III sex offender. Appellant timely appealed and asserts the following errors for our review:

1. The trial court erred in denying Appellant's Crim.R. 29 motion.

2. The jury's verdict was against the manifest weight of the evidence presented at trial.

## II. Law & Analysis

{¶ 55} Rodenberger challenges the trial court's denial of his Crim.R. 29 and the weight of the evidence in support of his convictions. We review each assignment in turn.

16.

## A. Denial of Crim.R. 29 Motion

{¶ 56} In his first assignment of error, Rodenberger argues that the trial court erred in denying his Crim.R. 29 motion for judgment of acquittal because the state failed to present sufficient evidence to support each element of his rape and sexual battery convictions. Rodenberger was convicted of rape as defined by R.C. 2907.02(A)(1)(c) which states:

> No person shall engage in sexual conduct with another who is not the spouse of the offender or who is the spouse of the offender but is living separate and apart from the offender when any of the following applies:
>
> * * *
>
> The other person's ability to resist or consent is substantially impaired because of a mental of physical condition * * * and the offender knows or has reasonable cause to know that the other person's ability to resist or consent is substantially impaired because of a mental or physical condition[.]

Rodenberger was also convicted of sexual battery as defined by R.C. 2907.03(A)(2) which states:

> No person shall engage in sexual conduct with another, not the spouse of the offender, when any of the following apply:
>
> * * *

The offender knows that the other person's ability to appraise the nature of or control the other person's own conduct is substantially impaired.

Both of these offenses require the state to prove that the defendant knew that the victim was substantially impaired. In his Crim.R. 29 motion, Rodenberger argued that the trial court failed to present sufficient evidence of the knowledge element. We disagree.

{¶ 57} "The standard of review for a denial of a Crim.R. 29 motion is the same as the standard of review for sufficiency of the evidence." *State v. Johnson*, 6th Dist. Wood Nos. WD-13-008, WD-13-009, 2014-Ohio-2435, ¶ 11. In reviewing a challenge to the sufficiency of the evidence, we view the evidence in a light most favorable to the prosecution and determine whether "any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." (Internal citations omitted.) *State v. Smith*, 80 Ohio St.3d 89, 113, 684 N.E.2d 668 (1997). In making that determination, the appellate court will not weigh the evidence or assess the credibility of the witnesses. *State v. Were*, 118 Ohio St.3d 448, 2008-Ohio-2762, 890 N.E.2d 263, ¶ 132. Whether there is sufficient evidence to support a conviction is a question of law. *State v. Thompkins*, 78 Ohio St.3d 380, 386, 678 N.E.2d 541 (1997).

{¶ 58} Rodenberger argues that the record contains insufficient evidence that J.B. was intoxicated and, even if she was, that he knew that J.B. was intoxicated. Intoxication, however, is not the sole basis upon which substantial impairment may be established. In *State v. Horn*, 2018-Ohio-779, 108 N.E.3d 158, ¶ 57-58 (6th Dist.) *rev'd*

*on other grounds*, 159 Ohio St.3d 359, 2020-Ohio-960, 152 N.E.3d 241, we held that sleep constituted a "substantial impairment" for purposes of R.C. 2907.02(A)(1)(c). Further, we held that evidence that a victim was asleep at the time of the sexual conduct was sufficient to prove that the offender knew of the victim's substantial impairment. *Id.* at ¶ 57-58.

{¶ 59} J.B. offered clear testimony that she was asleep when Rodenberger started having sex with her. Although Rodenberger testified that J.B. was awake, a rational juror could believe J.B. rather than Rodenberger. Accordingly, when this evidence is viewed in a light most favorable to the state, a rational juror could conclude that Rodenberger knew that J.B. was asleep when he began having sex with her and, therefore, knew that she was substantially impaired.

{¶ 60} We therefore find that the record contains sufficient evidence that Rodenberger knew that J.B. was substantially impaired as described in R.C. 2907.02(A)(1)(c) and the trial court did not err in denying Rodenberger's Crim.R. 29 motion for judgment of acquittal. Rodenberger's first assignment of error is found not well-taken.

### B. Manifest Weight of the Evidence

{¶ 61} In his second assignment of error, Rodenberger claims that his convictions were against the manifest weight of the evidence. He primarily relies on J.B.'s clear recollection of the incident, her varying descriptions of her own level of intoxication, and other witnesses' observations that J.B. was not slurring her words or stumbling.

19.

{¶ 62} When reviewing a claim that a verdict is against the manifest weight of the evidence, the appellate court must weigh the evidence and all reasonable inferences, consider the credibility of witnesses, and determine whether the jury clearly lost its way in resolving evidentiary conflicts so as to create such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. *Thompkins*, 78 Ohio St.3d at 387, 678 N.E.2d 541. We do not view the evidence in a light most favorable to the state. "Instead, we sit as a 'thirteenth juror' and scrutinize 'the factfinder's resolution of the conflicting testimony.'" *State v. Robinson*, 6th Dist. Lucas No. L-10-1369, 2012-Ohio-6068, ¶ 15, citing *Thompkins* at 388. Reversal on manifest weight grounds is reserved for "the exceptional case in which the evidence weighs heavily against the conviction." *Thompkins* at 387, quoting *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983).

{¶ 63} Here, J.B. testified that she drank 10-11 alcoholic beverages on the evening of July 20, 2018 and into the following morning. She testified that was intoxicated and she "passed out" in B.M.'s camper. She also testified that she was in such a deep sleep that she did not realize Rodenberger had removed her clothes and began having sex with her until she awoke during the act. Further, B.M. confirmed that J.B. was intoxicated when he walked her back to his camper. Multiple other witnesses testified that J.B. had been consuming alcohol throughout the course of the evening, and they described her intoxication level as between a 3 to an 8 out of 10.

{¶ 64} In contrast to these witnesses, Rodenberger testified that J.B. was not intoxicated (which was consistent with the testimony of T.R. and M.C.). And, in contrast to J.B.'s testimony, Rodenberger claimed that J.B. was awake at the time of intercourse, and that she initiated sex with him.

{¶ 65} Rodenberger argues that the jury's verdict is against the manifest weight of the evidence because his testimony was more reliable than the conflicting testimony of other witnesses. He argues that J.B.'s recollection of events was a little too good, and that she and other witnesses had inconsistent estimates of her intoxication level. But, contrary to Rodenberger's arguments, any inconsistencies between his and J.B.'s testimony, as well as that of other witnesses, does not render the verdict improper. "[I]t is well-established that 'a conviction is not against the manifest weight of the evidence solely because the jury heard inconsistent testimony.'" *State v. Talley*, 2016-Ohio-8010, 74 N.E.3d 868, ¶ 23 (6th Dist.), citing *State v. Wade*, 8th Dist. Cuyahoga No. 90029, 2008-Ohio-4574, ¶ 38. Here, we cannot say that the jury lost its way in resolving conflicting testimony.

{¶ 66} Moreover, we must "extend special deference to the jury's credibility determinations given that it is the jury who has the benefit of seeing the witnesses testify, observing their facial expressions and body language, hearing their voice inflections, and discerning qualities such as hesitancy, equivocation, and candor." *State v. Kamal*, 6th Dist. Lucas No. L-18-1094, 2019-Ohio-3928, ¶ 8, citing *State v. DeHass*, 10 Ohio St.2d 230, 227 N.E.2d 212 (1967). The jury observed J.B. testify and found her to be credible.

21.

In our view, the minor inconsistencies in her story do not overcome the deference that we must give to the jury's conclusion.

{¶ 67} In sum, the jury's verdict is supported by competent and credible evidence as to the essential elements of each offense. This is not the exceptional case in which the evidence weighs heavily against the conviction." *Thompkins* at 387. Therefore, we find Rodenberger's second assignment of error not well-taken.

### III. Conclusion

{¶ 68} Appellant's first and second assignments of error are found not well-taken and the July 5, 2019 judgment of the Lucas County Court of Common Pleas is affirmed. Appellant is ordered to pay the costs of this appeal pursuant to App.R. 24.

Judgment affirmed.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.

Thomas J. Osowik, J.            _____
                                               JUDGE
Christine E. Mayle, J.

Gene A. Zmuda, P.J.            _____
CONCUR.                                    JUDGE

                                             _____
                                               JUDGE

This decision is subject to further editing by the Supreme Court of Ohio's Reporter of Decisions. Parties interested in viewing the final reported version are advised to visit the Ohio Supreme Court's web site at: http://www.supremecourt.ohio.gov/ROD/docs/.