[Cite as *State v. Irvin*, 2022-Ohio-4417.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
WOOD COUNTY

State of Ohio                                           Court of Appeals No.  WD-21-076

        Appellee                                 Trial Court No.  2020CR0575

v.

Douglas S. Irvin, Jr.                              **DECISION AND JUDGMENT**

        Appellant                                Decided:  December 9, 2022

* * * * *

Paul A. Dobson, Wood County Prosecuting Attorney, and
David T. Harold, Chief Assistant Prosecuting Attorney, for appellee.

Joseph W. Westmeyer, III, for appellant.

* * * * *

**ZMUDA, J.**

## I. Introduction

{¶ 1} Appellant, Douglas Irvin, Jr., appeals the November 1, 2021 judgment of the

Wood County Court of Common Pleas convicting him of gross sexual imposition.  For

the following reasons, we affirm the trial court's judgment.

**A. Facts and Procedural Background**

{¶ 2} On December 17, 2020, appellant was indicted on one count of gross sexual imposition in violation of R.C. 2907.05(A)(4) and 2907.05(C)(2); a third-degree felony.[1] The gross sexual imposition charge arose from appellant having sexual contact with his then-step-daughter, H.G., a minor less than thirteen years of age, in 2013.

{¶ 3} Appellant was arrested on December 28, 2020, and appeared for arraignment the same day. At appellant's request, the trial court continued appellant's arraignment until the following day so that appellant could have additional time to review the indictment with counsel. At the arraignment hearing, appellant entered a not guilty plea to the gross sexual imposition offense.

{¶ 4} A pretrial hearing occurred on January 15, 2021. At that time, the trial court scheduled appellant's case for trial to begin on May 11, 2021. Following one continuance, appellant's two-day trial began on September 7, 2021. During the state's case-in-chief, the parties elicited the following testimony:

**Testimony of H.G.**

{¶ 5} H.G. began her testimony stating that appellant was previously married to her mother, M.I. H.G. could not recall when M.I. and appellant were married but subsequent testimony from other witnesses shows that they were married from July 7,

---

[1] We note that appellant was found not guilty on an additional indicted charge against a separate victim. For that reason, we reference that offense only to describe the investigation process as it relates to the victim in the present case.

2007 until May 6, 2010. It was during their marriage, and shortly after their divorce, that the events underlying appellant's conviction occurred.

{¶ 6} H.G. described her initial relationship with appellant as a "normal" relationship between a step-daughter and step-father. Sometime during the middle of appellant and M.I.'s marriage, when H.G. was eleven years old, her relationship with appellant changed "when he started touching me." Specifically, H.G. testified that appellant began touching her breasts both over and under her clothing twice a week. After appellant and M.I.'s divorce, appellant continued to visit with M.I. at her residence. During that time, he continued to touch H.G.'s breasts approximately once a week. This conduct typically occurred on evenings when appellant arrived home late from work while the other members of the household were asleep. H.G. testified that this conduct occurred in multiple locations in the residence including her bed, her mother's bed, on the couch, and one instance in the bathroom. When asked how many times this occurred, H.G. stated "too many times to count."

{¶ 7} H.G. first reported appellant's conduct to her mother in 2012. During her direct examination, H.G. was unsure of the date of this first disclosure but on cross-examination, defense counsel refreshed her recollection through prior testimony that it occurred in June, 2012. H.G. explained that the reason for her delayed disclosure was her fear of appellant, her fear of not being believed, and her fear that nothing would happen. She testified that her mother did not believe her after the initial disclosure. Appellant

3.

continued touching H.G. after that first disclosure and she again informed her mother of the continued behavior several months later.

{¶ 8} On cross-examination, H.G. testified that appellant used to playfully wrestle with her during their relationship. She also testified that appellant attempted to teach her self-defense skills that involved physical contact. Lastly, H.G. acknowledged that her second disclosure of appellant's conduct in 2013 occurred shortly after appellant expressed his desire that H.G. should not attend a trip to Canada with her Girl Scout troop.

### Testimony of Sergeant Scott Moskowitz

{¶ 9} Scott Moskowitz is a Sergeant with the Perrysburg Township Police Department. At the time of his testimony, Moskowitz had served in the Department for 22 years. Relevant to the present case, he served as a detective in the Department from 2009 to 2014. During that time, he also served on the F.B.I.'s Violent Crimes Against Children task force. During that time, Sergeant Moskowitz received training specialized in investigating crimes against children. He noted that during his time as a detective he received training on conducting interviews with children through a technique known as forensic interviewing. This technique involved asking the children open-ended questions to avoid influencing their answers. When performing an interview with a child, Moskowitz coordinated those interviews with the applicable children's services agency to

4.

ensure the child would only need to be interviewed once. Moskowitz estimated that he investigated over one hundred children sexual assault cases during his time as a detective.

{¶ 10} Moskowitz testified that, based on his experience, a minor's delayed disclosure of a sexual assault is "very common." Moskowitz then identified the present case as one that involved a delayed disclosure. The investigation of H.G.'s allegations occurred in 2013 after H.G. and M.I. reported the allegations to a patrol officer.

{¶ 11} As part of that investigation, Moskowitz and the Children's Services agency conducted an interview with H.G.[2] He subsequently interviewed appellant. Appellant stated that he was "shocked" and indicated that this interview was the first time he was made aware of the allegations. Appellant then suggested that H.G. made the allegations because she was upset that appellant recently announced that he was getting remarried. Appellant also suggested that H.G. was upset because appellant spent less time with her than his other children. Moskowitz could not recall whether appellant was still married to M.I. or living at her residence at the time appellant's conduct occurred. However, Moskowitz stated that if appellant was not married to M.I. at the time that appellant was still at the residence "a lot" to assist with childcare.

{¶ 12} Moskowitz conducted a second interview with appellant approximately two months later. Appellant maintained his position that these incidents did not occur. After

---

[2] The record does not identify the specific agency that participated in the underlying investigation. The identity of the agency is not relevant to our resolution of this appeal. To avoid any presumptions regarding the agency's identity, we refer to it generically as "Children's Services."

5.

Moskowitz informed appellant that he did not believe him, appellant suggested that he may have inadvertently made contact with H.G.'s breasts while instructing her on self-defense tactics.

{¶ 13} On cross-examination, Moskowitz recalled that H.G. had originally disclosed the allegations against appellant to M.I. in 2012—the summer before Moskowitz conducted the investigation. M.I. did not file a police report following this initial disclosure. Moskowitz also recalled that appellant's announcement that he was getting remarried occurred "at the time" that M.I. filed the police report in 2013. Moskowitz concluded his investigation in April, 2013. Appellant was not indicted until 2020. Moskowitz did not receive any additional evidence between the conclusion of his investigation and appellant's indictment. Additionally, there were no eyewitnesses to the offense and no physical evidence was collected at any time.

{¶ 14} During his redirect and recross-examinations, Moskowitz stated that physical evidence, specifically any DNA evidence, would not be present in this case due to the delayed disclosure. He also testified that having eyewitnesses to an offense against children is rare. Lastly, he testified that some of his investigations have resulted in a finding that the allegations were false.

### Testimony of Detective Sergeant Todd Curtis

{¶ 15} Todd Curtis is a detective sergeant with the Perrysburg Township Police Department. At the time of his testimony, Curtis had been a police officer for 29 years,

6.

including 15 years as a detective. In addition to his peace officer training, Curtis has also been certified as a master criminal investigator through the Ohio Attorney General's Office. This allows him to attend advanced training programs including courses on criminal profiling, advanced sex crimes investigation, and sexually deviant behavior. Curtis is also certified as an interrogation expert through the State Police Academy. Curtis testified that during the interrogation of a suspect, officers are trained to look for signs of deception when interviewing a suspect. When interviewing alleged victims, officers are trained to look for consistency in the victim's story over the course of multiple interviews. Curtis estimated that he has investigated more than two hundred sexual assault cases. Half of those cases involved juvenile victims.

{¶ 16} Curtis testified that approximately eighty percent of the juvenile victim cases he investigated involved delayed disclosure of the sexual conduct. He described delayed disclosure as the victim "internalizing" what happened to them rather than reporting it to the police, counselors, or other advocates. He described fear, particularly in cases in which the alleged perpetrator is a family member, as the primary reason a victim would delay disclosure. He also noted that juveniles generally found it difficult to remember the exact dates on which the offenses occurred.

{¶ 17} Curtis also testified that in cases of delayed disclosure, he would not expect to collect any physical evidence such as DNA or bodily fluids because they decay over time or are washed out of clothing. In cases in which the allegations only involve the

7.

touching of a victim, he stated that it is unlikely that investigators will find any transferred DNA evidence unless the evidence collection is made "immediately after the event."

{¶ 18} Regarding the underlying case, Curtis testified that he first heard of the allegations against appellant in 2012 or 2013 while Moskowitz conducted his investigation. In April, 2020, Children's Services invited Curtis to participate in an interview with another individual alleging that appellant had sexually assaulted her several years earlier. Curtis was unable to attend the interview but as part of the new investigation he reviewed Moskowitz's 2013 investigation of H.G.'s allegations. He then conducted a new interview with H.G. He described H.G.'s 2020 interview as "almost identical" to her 2013 interview.

{¶ 19} On cross-examination, Curtis described the procedure by which investigators determine "the best day range possible" for when the offense occurred. This involves interviews with parents and comparing their recollections to the victim's. He noted that there would be "wiggle room" when the disclosure and the subsequent investigation were separated by long periods of time.

### Appellant's Crim.R. 29 Motion

{¶ 20} At the conclusion of Curtis's testimony, the state rested its case-in-chief. Appellant then made an oral Crim.R. 29 motion for acquittal, arguing the state failed to present sufficient evidence to support the gross sexual imposition charge. Appellant

8.

accurately stated that to support a guilty verdict for gross sexual imposition, R.C. 2907.05(A)(4) required the state to present evidence that appellant touched H.G.'s breasts for the purpose of his or her sexual arousal or gratification. Appellant's counsel argued that "[t]here has been absolutely no testimony presented regarding sexual gratification of [H.G.] herself or, in fact, of anything from [appellant], who is alleged to have done this contact." Because the intent to be sexually aroused or gratified by the underlying contact is an element of the offense, appellant argued that the state's presentation of evidence was insufficient to support a conviction and requested the trial court enter a judgment of acquittal. In response, the state argued that the repetitive nature of the contact, coupled with the fact that it involved contact under H.G.'s clothes, was sufficient to support the elements of the offense.

{¶ 21} The trial court denied appellant's motion. Appellant then proceeded with his case-in-chief, during which he elicited the following testimony:

### Testimony of Matthew Reger

{¶ 22} Matthew Reger[3] served as a guardian ad litem during post-divorce proceedings between appellant and M.I. in 2013. He described the duties of a guardian ad litem ("GAL") as a court-appointed representative for children who are the subject of a custody dispute. To represent the children, the GAL conducts an investigation by

---

[3] We note that at the time of his testimony, The Hon. Judge Matthew Reger was serving, and continues to serve at the time of this appeal, as a judge in the Wood County Court of Common Pleas. Neither party objected to him being called as a witness at the underlying trial.

speaking to the parties to the dispute, the children, and "anyone else who is of interest." The GAL then makes a recommendation to the court on how the custody dispute should be resolved.

{¶ 23} Reger's service as GAL related to a dispute between appellant and M.I. over custody of their child, H.G.'s half-sibling. During his investigation, he was made aware of H.G.'s allegations against appellant. He noted that his report reflected that the prosecutor declined to indict appellant at that time. He also testified that he, personally, believed H.G.'s allegations despite the prosecutor declining to indict appellant at that time.

{¶ 24} On cross-examination, Reger confirmed that he had testified in a previous hearing between appellant and M.I. while serving as GAL. During that hearing, he testified that H.G. had first informed M.I. of appellant's conduct in 2012. Reger also confirmed that H.G. testified that appellant touched her breasts during that prior hearing. Lastly, Reger stated that at the time of the prior hearing, appellant alleged that H.G. made the allegations because she was jealous of the time appellant spent with his other children and because appellant would not pay for her trip to Canada.

**Testimony of M.I.**

{¶ 25} M.I. testified that she married appellant on July 7, 2007. Their marriage ultimately ended in divorce but appellant continued living with M.I. for "a couple of years." During that time, appellant's working hours generally lasted from early morning

10.

until around 5:00 or 6:00 p.m. Appellant was typically home at the same times as M.I. M.I. never saw appellant engaged in any conduct with H.G. that she believed was inappropriate.

{¶ 26} M.I. testified that H.G. first disclosed appellant's conduct to her in 2012. She did not contact the police at that time. H.G. did not make any further allegations or comment on the prior allegations until 2013. At that time, H.G. informed M.I. that appellant's conduct had continued after the initial disclosure. M.I. contacted the police after this second disclosure. The second disclosure occurred contemporaneous with appellant's announcement that he was getting remarried. M.I. also testified that appellant showed H.G. affection as a step-father and did wrestle with her as part of their relationship.

{¶ 27} On cross-examination, M.I. stated that although appellant informed H.G. that she could not attend the trip to Canada, appellant did not have authority to make that decision. She also noted that appellant's desire did not prevent H.G. from attending the trip.

### Appellant's Renewed Crim.R. 29 Motion, Jury Verdict, and Sentencing

{¶ 28} Appellant rested his case-in-chief at the close of M.I.'s testimony. The state declined to present any rebuttal testimony. Appellant then renewed his Crim.R. 29 motion for judgment of acquittal, incorporating the same argument made in his original

11.

motion at the close of the state's case-in-chief. The trial court again denied appellant's motion.

{¶ 29} The parties then proceeded to closing arguments followed by submission of the case to the jury. Following its deliberation, the jury found appellant guilty of gross sexual imposition in violation of R.C. 2907.05(A)(4) and 2907.05(C)(2). On October 29, 2021, appellant was sentenced to 54-month prison term. The trial court's judgment was memorialized on November 1, 2021.

## B. Assignments of Error

{¶ 30} Appellant timely appealed and asserts the following errors for our review:

1. The trial court erred to the prejudice of appellant by denying his Crim.R. 29 motion.

2. The jury's verdict was against the manifest weight of the evidence presented at trial.

## II. Law and Analysis

### A. The trial court did not err in denying appellant's Crim.R. 29 motion.

{¶ 31} In his first assignment of error, appellant argues that the state did not introduce sufficient evidence to support his conviction. "The standard of review for a denial of a Crim.R. 29 motion is the same as the standard of review for sufficiency of the evidence." *State v. Johnson,* 6th Dist. Wood Nos. WD-13-008, WD-13-009, 2014-Ohio-2435, ¶ 11. In reviewing a challenge to the sufficiency of the evidence, we view the

12.

evidence in a light most favorable to the prosecution and determine whether "any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *State v. Smith*, 80 Ohio St.3d 89, 113, 684 N.E.2d 668 (1997). In making that determination, the appellate court will not weigh the evidence or assess the credibility of the witnesses. *State v. Were*, 118 Ohio St.3d 448, 2008-Ohio-2762, 890 N.E.2d 263, ¶ 132. Whether there is sufficient evidence to support a conviction is a question of law. *State v. Thompkins*, 78 Ohio St.3d 380, 386, 678 N.E.2d 541 (1997).

{¶ 32} Appellant was convicted of gross sexual imposition in violation of R.C. 2907.05(A)(4) which states:

> (A) No person shall have sexual contact with another, not the spouse of the offender; cause another, not the spouse of the offender, to have sexual contact with the offender; or cause two or more persons to have sexual contact when any of the following applies:
>
> * * *
>
> (4) The other person, or one of the other persons, is less than thirteen years of age, whether or not the offender knows the age of that person.

R.C. 2907.01 defines "sexual contact" as:

> any touching of an erogenous zone of another, including without limitation the thigh, genitals, buttock, pubic region, or, if the person is a female, a breast, for purposes of sexually arousing or gratifying either person.

In his Crim.R. 29 motion, appellant argued that the state did not introduce any evidence to show that appellant's touch of H.G.'s breasts was for the purpose of sexually arousing or gratifying himself or H.G. Specifically, appellant argued that "[t]here needs to be some testimony to determine sexual gratification by either party in this case. * * * There was no indication from any witness as to anything that Mr. Irvin did in response to these—or how he reacted to the touching to substantiate sexual gratification." Appellant now argues that the trial court's denial of his motion on these ground constitutes reversible error. We disagree.

{¶ 33} In order to introduce sufficient evidence that appellant touched H.G.'s breasts for the purpose of sexual arousal or gratification, the state was not obligated to show that appellant "was *actually* sexually aroused or gratified," but that he touched H.G. "for that purpose." *State v. Heiney,* 2018-Ohio-3408, 117 N.E.3d 1034, ¶ 92 (6th Dist.), citing *State v. Brown,* 3d Dist. Hardin No. 6-12-01, 2012- Ohio-3904, ¶ 21 (emphasis added). "In the absence of direct testimony regarding sexual arousal or gratification, 'the trier of fact may infer a purpose of sexual arousal or gratification from the type, nature and circumstances of the contact, along with the personality of the defendant." *Id.,* citing *State v. S.H.W.,* 2d Dist. Greene No. 2015-CA-25, 2016-Ohio-841, ¶ 62. "From these facts, the trier of facts may infer what the defendant's motivation was in making the physical contact with the victim." *Id.*

{¶ 34} Since the state was not obligated to introduce evidence that appellant was actually aroused or gratified by his conduct, appellant's argument that the lack of any such testimony warranted a dismissal under Crim.R. 29 fails as a matter of law. Moreover, we find that the state elicited sufficient testimony to permit the trier of fact to infer that appellant touched H.G.'s breasts with the purpose of sexual arousal or gratification. H.G. testified that appellant touched her breasts both over and under her clothing "too many times to count." She testified that the contact often occurred when appellant arrived home late from work when all other members of the household were asleep. She also testified that appellant's conduct occurred in multiple locations throughout the residence including her bed and her parent's bed. Viewing this testimony in a light most favorable to the state, a reasonable juror could infer appellant's contact with H.G. was for the purpose of sexual arousal or gratification based on the nature and circumstances of that contact.

{¶ 35} In light of this conclusion, we find that "any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *Smith,* 80 Ohio St.3d 89, 113, 684 N.E.2d 668. The state introduced sufficient evidence to support the purposeful touching element of his conviction for gross sexual imposition. As a result, the trial court did not err in denying appellant's Crim.R. 29 motion and we find his first assignment of error not well-taken.

**B. Appellant's conviction was not against the manifest weight of the evidence.**

{¶ 36} In his second assignment of error, appellant argues that his conviction was against the manifest weight of the evidence. "When examining whether a conviction was contrary to the manifest weight of the evidence, the appellate court serves as a 'thirteenth juror' to conclude whether the trial court lost its way so significantly as to result in a manifest miscarriage of justice, necessitating that the conviction be overturned." *State v. Butler*, 6th Dist. Lucas No. L-08-1390, 2010-Ohio-178, ¶ 11. We note that questions regarding the "weight and credibility of evidence are primarily for the trier of fact." *State v. Teal*, 6th Dist. Lucas Nos. L-15-1280 and L-15-1281, 2017-Ohio-7202, ¶ 58, citing *State v. Pena,* 6th Dist. Lucas No. L-12-1309, 2014-Ohio-423, ¶ 22. This court's "discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction." *Thompkins*, 78 Ohio St.3d at 386, 678 N.E.2d 541, quoting *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983).

{¶ 37} The state inarguably elicited testimony in support of appellant's conviction. In addition to H.G.'s testimony, the state also elicited testimony from the investigating detectives. Detective Moskowitz explained to the jury why there was a lack of evidence in delayed disclosure cases. Detective Curtis testified that H.G.'s allegations remained consistent during her two interviews despite having been conducted seven years apart.

16.

**{¶ 38}** Appellant argues that the jury, in reaching its verdict, disregarded conflicting testimony and focused on the nature of the charges rather than the evidence presented. Specifically, appellant notes that the lack of physical evidence or eyewitnesses should have weighed in favor of acquittal. He also notes that M.I. testified that appellant did not work late enough into the evening to support H.G.'s allegation that the contact occurred while others were sleeping and that M.I.'s decision to continue living with appellant after H.G.'s first disclosure showed that the allegations were unsubstantiated. Finally, appellant argues that the jury disregarded testimony regarding the timing of the allegations—that is, that the allegations occurred when H.G. was upset with appellant for trying to prevent her trip to Canada and the announcement of his engagement—that showed the accusations were only retaliatory in nature. In light of the jury's alleged disregard of these facts, appellant concludes that "the jury was distracted by the emotional weight of the charges against appellant," resulting in a verdict that was against the manifest weight of the evidence.

**{¶ 39}** Having reviewed the record, we find that the jury's verdict is not against the manifest weight of the evidence. First, "it is well-established that a conviction is not against the manifest weight of the evidence solely because the jury heard inconsistent testimony." *State v. Rodenberger,* 6th Dist. Lucas No. L-19-1163, 2020-Ohio-6979, ¶ 65, citing *State v. Talley,* 2016-Ohio-8010, 74 N.E.3d 868, ¶ 23 (6th Dist.). Second, appellant's claim that the jury disregarded certain testimony suggests that he merely

17.

disagrees with the jury's assessment of the weight and credibility of that testimony. Determining the weight and credibility of that evidence, however, is primarily a decision for the jury. *Teal* at ¶ 58. While appellant identifies testimony that arguably supports his defense, we cannot say that that testimony weighs so heavily against a conviction that the jury lost its way in finding appellant guilty. Put simply, this is not an "exceptional case" that warrants reversal.

{¶ 40} For these reasons, we find that the jury's verdict was not against the manifest weight of the evidence. Therefore, we find appellant's second assignment of error not well-taken.

### III. Conclusion

{¶ 41} We find appellant's first and second assignments of error not well-taken. We affirm the November 1, 2021 judgment of the Wood County Court of Common Pleas. Appellant is ordered to pay the costs of this appeal pursuant to App.R. 24.

Judgment affirmed.


A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.

Mark L. Pietrykowski, J.     _____
                  JUDGE
Thomas J. Osowik, J.    

                 _____
Gene A. Zmuda, J.         JUDGE
CONCUR.

                 _____
                  JUDGE

18.

This decision is subject to further editing by the Supreme Court of
Ohio's Reporter of Decisions.  Parties interested in viewing the final reported
version are advised to visit the Ohio Supreme Court's web site at:
http://www.supremecourt.ohio.gov/ROD/docs/.