[Cite as *State v. Talley*, 2016-Ohio-8010.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
LUCAS COUNTY

State of Ohio                                      Court of Appeals No. L-15-1187

    Appellee                                  Trial Court No. CR0201501211

v.

Christopher Talley                          **DECISION AND JUDGMENT**

    Appellant                                  Decided: December 2, 2016

* * * * *

Julia R. Bates, Lucas County Prosecuting Attorney, and
Evy M. Jarrett, Assistant Prosecuting Attorney, for appellee.

Karin L. Coble, for appellant.

* * * * *

**YARBROUGH, J.**

## I. Introduction

{¶ 1} Appellant, Christopher Talley, appeals the judgment of the Lucas County

Court of Common Pleas, ordering him to serve a prison sentence of 21 years after a jury

found him guilty of two counts of aggravated robbery with attendant firearms specifications and two counts of having weapons while under disability.

## A. Facts and Procedural Background

{¶ 2} This matter stems from a series of two robberies that occurred in Toledo in January 2015. The first robbery occurred on January 23, 2015, at a Valero store located at 950 West Alexis Road. Saif Fouad, the store clerk working at the Valero store, testified at trial that two individuals entered the store and one of the individuals pointed a gun at Fouad, instructing him to "put the money in the plastic bag and give it to me." Fouad recognized the gunman as one of his "regular customers." Fouad complied with the robber's request and placed the money from the register into the plastic bag. Afterwards, the two individuals exited the store and Fouad called 911. The robbery was captured on Valero's video surveillance system.

{¶ 3} When asked about the physical characteristics of the gunman, Fouad described the individual as a tall black male with a goatee and a mustache. During his 911 phone call, Fouad stated that the gunman was wearing a gray hoodie and black pants. Fouad stated that the other robber locked the entrance door and remained next to the door during the robbery, acting as a lookout. Fouad could not identify the other robber's gender. According to Fouad's estimate, the robbery lasted between 15 and 25 seconds.

{¶ 4} Toledo police officer Don O'Brien responded to Fouad's report of an armed robbery at the Valero store. Upon O'Brien's arrival, Fouad explained to O'Brien that the gunman was a black male wearing a gray hoodie with black pants, black shoes, and a black knit hat. Fouad went on to state that the gunman was six feet two inches tall.

2.

Fouad informed O'Brien that the other robber was a black female who was approximately five feet six inches tall and about 150 pounds. He recounted to O'Brien that the second robber was wearing a black coat, black pants, and black shoes.

{¶ 5} Four days later, the same two individuals that were displayed on Valero's video surveillance system during the robbery entered the BP Stop & Shop located at 1702 West Laskey and robbed it as well. Larry Roberts, the store clerk at the BP Stop & Shop, was working on the morning of the robbery. After opening the store, Roberts waited on a couple of customers. Within an hour of opening the store, Roberts noticed two individuals enter. At trial, Roberts described one of the individuals as a male standing between six feet and six feet one inch tall with a medium build and light skin. When asked about the race of the individual, Roberts stated he was unsure, but suggested the individual could have been Puerto Rican or black. He also stated that this individual was wearing gray sweatpants with a black stripe and was holding a black .45 caliber handgun at his side. Roberts stated that he was unable to see the gunman's face but was able to see his eyes. As for the individual who accompanied the gunman, Roberts indicated that she was a female who was wearing black sweatpants, a dark leather coat, a red scarf, and a black knit hat. Later in his testimony, Roberts stated that he recognized the female robber as a former employee, Jamika Tucker, whom he had counseled on occasion.[1] He noticed that the leather jacket and scarf she was wearing was the same jacket and scarf Tucker had previously worn to work, and he also recognized her eyes.

---

[1] The state called the district manager who worked for the stores involved in the robberies in this case, Tiffany Ortega, who also recognized Tucker as the female robber.

3.

{¶ 6} Upon entering the store, the gunman approached Roberts and told him that he intended to rob the store. The gunman stated that he did not intend to hurt anyone. Rather, he simply wanted Roberts to "open the safe." Meanwhile, Tucker was attempting to steal cigarettes from the cigarette cabinet inside the store. At the conclusion of the robbery, Roberts activated the silent alarm and dialed 911.

{¶ 7} After being notified of Tucker's identity, Toledo police dispatched a team of officers, including Sergeant Kevin Korsog, to Tucker's address at 6153 Jackman, Toledo, Ohio. Upon arrival, Korsog knocked on the door. After some hesitation, Tucker eventually answered the door and the officers entered the home. Once inside, Korsog found another male individual, Jacinto Reed. He ordered Reed to remain seated and asked Tucker if any other individuals were inside the home. Tucker failed to provide a direct answer to Korsog's question, so officers proceeded to search the home for other occupants. As a result of their search, the officers discovered appellant hiding in the kitchen. Tucker, Reed, and appellant were then separated and transported to the Safety Building to be interviewed. After three interviews, Tucker confessed to the robberies and implicated appellant as the gunman.

{¶ 8} Thereafter, a search warrant was obtained for Tucker's residence. Upon executing the search warrant, Toledo police officer Israel Garrett discovered a blue knapsack, two black leather jackets, two cartons of Fortuna cigarettes, and a black handgun with tape around the handle. The cigarettes were located inside the sleeve of one of the black leather jackets found in the home. The handgun was found inside a window sill in the kitchen behind a mattress that was lying against the wall.

4.

**{¶ 9}** As a result of the search and the statement Tucker provided to police, appellant was indicted on February 5, 2015, and charged with two counts of aggravated robbery in violation of R.C. 2911.01(A)(1), felonies of the first degree, along with attendant firearms specifications as to each count, as well as two counts of having weapons while under disability in violation of R.C. 2923.13(A)(2), felonies of the third degree. The matter proceeded through pretrial and a four-day jury trial commenced on June 22, 2015.

**{¶ 10}** At trial, the state called several witnesses, including Tucker. Tucker testified that she formerly worked with Larry Roberts at the BP Stop & Shop. She stated that she was in an "on and off" relationship with appellant for one year prior to the commission of the robberies in this case, during which time appellant would occasionally walk her to and from work.

**{¶ 11}** When asked about the robberies, Tucker acknowledged her involvement and identified appellant as the gunman. She described appellant's firearm as a "black gun with tape on * * * the hand part." This description matched the firearm that was seized by authorities during the execution of the search warrant at Tucker's residence. Tucker stated that appellant wore a gray hooded sweatshirt and gray sweatpants during the robbery of the Valero store. She went on to testify that appellant dressed in layers during the robbery of the BP Stop & Shop. Tucker further explained that appellant wore jeans underneath his gray sweatpants. All of these statements were corroborated by the evidence discovered by authorities during the search of Tucker's residence, which was admitted at trial.

5.

**{¶ 12}** After the robbery of the BP Stop & Shop was finished, Tucker and appellant walked across the street and entered a Kroger store to change clothes. On the way to Kroger, appellant placed his handgun inside a plastic Kroger bag and placed the bag in a trash can. Appellant then entered Kroger, walked to the restroom, took off the sweatpants and jeans, and put the jeans back on over the sweatpants. Eventually, the two made their way back to Tucker's residence, where they were subsequently arrested.

**{¶ 13}** At the conclusion of the state's case-in-chief, appellant moved for acquittal under Crim.R. 29. In denying the motion, the court noted the extent of the evidence produced by the state at trial. The matter then proceeded to closing arguments and jury instructions, appellant having elected not to take the stand in his defense or present any witnesses of his own. Ultimately, the jury returned verdicts of guilty as to all charges contained in the indictment. The court then set the matter for sentencing and ordered a presentence investigation report.

**{¶ 14}** At sentencing, the court ordered appellant to serve six years in prison as to each aggravated robbery charge, to be served consecutively, plus another three years on each charge pursuant to the firearms specifications. In addition, the court imposed a two-year prison sentence on each charge for having weapons while under disability, to be served concurrently to one another but consecutively to the sentences imposed for the aggravated robbery charges. Further, the court found that appellant committed the aforementioned crimes while under post release control from a prior aggravated robbery conviction. Because of this post release control violation, the court imposed an additional one-year sentence, to be served consecutive to the sentences imposed in this

6.

case. In all, appellant was ordered to serve 21 years in prison and pay the costs of supervision, confinement, assigned counsel, prosecution, and restitution to Valero and BP Stop & Shop.

### B. Assignments of Error

{¶ 15} Appellant timely appealed the trial court's order, assigning the following errors for our review:

Assignment of Error One: Appellant's convictions are not supported by sufficient evidence and are against the manifest weight of the evidence.

Assignment of Error Two: The trial court erred in failing to merge the two counts of having weapons under a disability for sentencing, and violated the Double Jeopardy Clauses of the Fifth Amendment to the United States Constitution and Section 10, Article I of the Ohio Constitution.

Assignment of Error Three: The State committed prosecutorial misconduct in closing arguments, such that appellant was deprived of a fair trial.

Assignment of Error Four: The trial court erred in imposing the cost of appointed counsel fees and costs of confinement.

### II. Analysis

### A. Sufficiency and Manifest Weight

{¶ 16} In appellant's first assignment of error, he argues that his convictions are not supported by sufficient evidence and are against the manifest weight of the evidence.

7.

While sufficiency and manifest weight are distinct concepts, we will address them together.

{¶ 17} When evaluating whether the evidence was sufficient to sustain a conviction, we must determine whether the evidence admitted at trial, "if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus, citing *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.E.2d 560 (1979); *see also State v. Thompkins*, 78 Ohio St.3d 380, 678 N.E.2d 541 (1997). Therefore, "[t]he verdict will not be disturbed unless the appellate court finds that reasonable minds could not reach the conclusion reached by the trier-of-fact." *State v. Dennis*, 79 Ohio St.3d 421, 430, 683 N.E.2d 1096 (1997), citing *Jenks* at paragraph two of the syllabus.

{¶ 18} When reviewing a manifest weight claim,

> The court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. The discretionary power to grant a new trial should be exercised only in the exceptional case in which the

8.

evidence weighs heavily against the conviction. *State v. Lang*, 129 Ohio St.3d 512, 2011-Ohio-4215, 954 N.E.2d 596, ¶ 220.

{¶ 19} The crime of aggravated robbery is codified in R.C. 2911.01. Relevant here, R.C. 2911.01 provides:

> (A) No person, in attempting or committing a theft offense, as defined in section 2913.01 of the Revised Code, or in fleeing immediately after the attempt or offense, shall do any of the following:
>
> (1) Have a deadly weapon on or about the offender's person or under the offender's control and either display the weapon, brandish it, indicate that the offender possesses it, or use it;
>
> * * *
>
> (C) Whoever violates this section is guilty of aggravated robbery, a felony of the first degree.

{¶ 20} The crime of having weapons while under disability is codified in R.C. 2923.13, which states in relevant part:

> (A) Unless relieved from disability under operation of law or legal process, no person shall knowingly acquire, have, carry, or use any firearm or dangerous ordnance, if any of the following apply:
>
> * * *
>
> (2) The person is under indictment for or has been convicted of any felony offense of violence or has been adjudicated a delinquent child for the

commission of an offense that, if committed by an adult, would have been a felony offense of violence.

{¶ 21} That two robberies were committed in this case, one at the Valero store and another at the BP Stop & Shop, is uncontested. Indeed, the video surveillance and trial testimony confirm that Tucker and another individual entered both stores and demanded money from the cashiers. Further, the video surveillance depicts the other individual brandishing a deadly weapon in an effort to force the cashiers to comply with his demands.

{¶ 22} Notwithstanding the foregoing, appellant argues that the state failed to establish that appellant was the gunman responsible for the robberies that took place at Valero and BP Stop & Shop. In so arguing, appellant alleges certain inconsistencies in the trial testimony, and urges that Tucker's testimony lacked credibility in light of the fact that she was a "co-defendant with an interest in receiving a lesser sentence through her testimony."

{¶ 23} Regarding appellant's argument concerning alleged inconsistencies in the testimony, it is well-established that "'[a] conviction is not against the manifest weight of the evidence solely because the jury heard inconsistent testimony.'" *State v. Wade*, 8th Dist. Cuyahoga No. 90029, 2008-Ohio-4574, ¶ 38, quoting *State v. Asberry*, 10th Dist. Franklin No. 04AP-1113, 2005-Ohio-4547, ¶ 11. Having considered the testimony presented at trial, we find no inconsistencies that are material to the identification of appellant as the perpetrator of the robberies at issue in this case.

10.

{¶ 24} We now turn to appellant's argument that Tucker was an unbelievable witness because she was upset with him and wished to receive a lesser sentence by testifying against him. During cross-examination, Tucker was subjected to rigorous questioning exploring her potential bias stemming from her angst against appellant and her desire to receive a reduced sentence by testifying in this case. While we must consider the credibility of the witnesses in a manifest weight challenge, "that review must nevertheless be tempered by the principle that weight and credibility are primarily for the trier of fact." *State v. Kash*, 1st Dist. Butler No. CA2002-10-247, 2004-Ohio-415, ¶ 25. The trier of fact is in the best position to "view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony." *Id.* at ¶ 25. "The jury may believe all that a witness has said, or part or none of it." *Barker v. Century Ins. Group*, 10th Dist. Franklin No. 06AP-377, 2007-Ohio-2729, ¶ 14.

{¶ 25} Tucker's credibility was primarily for the jury to determine. After reviewing the record, we cannot say that the jury clearly lost its way in believing Tucker. Tucker testified that she acted in concert with appellant to commit the robberies for which appellant was convicted. The clothing, handgun, and other evidence discovered at Tucker's residence matches the description of the items used in the commission of the robberies provided by Tucker, Fouad, and Roberts. Moreover, Tucker's articulation of the facts was in harmony with the video surveillance recovered from the crime scenes. Therefore, we find no merit to appellant's assertion that the jury lost its way in believing

11.

Tucker's identification of appellant as the gunman. Further, we find that the jury's verdict was supported by sufficient evidence and was not against the manifest weight of the evidence.

{¶ 26} Accordingly, appellant's first assignment of error is not well-taken.

## B. Allied Offenses of Similar Import

{¶ 27} In his second assignment of error, appellant asserts that the trial court erred in failing to merge his convictions for having weapons while under disability. Concerning merger of allied offenses of similar import, R.C. 2941.25 provides:

(A) Where the same conduct by defendant can be construed to constitute two or more allied offenses of similar import, the indictment or information may contain counts for all such offenses, but the defendant may be convicted of only one.

(B) Where the defendant's conduct constitutes two or more offenses of dissimilar import, or where his conduct results in two or more offenses of the same or similar kind committed separately or with a separate animus as to each, the indictment or information may contain counts for all such offenses, and the defendant may be convicted of all of them.

{¶ 28} In *State v. Ruff*, 143 Ohio St.3d 114, 2015-Ohio-995, 34 N.E.3d 892, ¶ 25, the Supreme Court of Ohio examined R.C. 2941.25 and held that a defendant may be convicted and sentenced for multiple offenses where the offenses (1) caused separate, identifiable harm, (2) were committed separately, or (3) were committed with separate animus or motivation. The court went on to indicate that "the allied-offense analysis is

12.

dependent upon the facts of a case because R.C. 2941.25 focuses on the defendant's conduct. * * * When a defendant's conduct victimizes more than one person, the harm for each person is separate and distinct, and therefore, the defendant can be convicted of multiple counts."

{¶ 29} Here, appellant argues the offenses should merge "[b]ecause appellant's possession of the firearm was one continuous act, from the unknown date of acquisition until his arrest." A similar argument was recently rejected in *State v. Dean*, 146 Ohio St.3d 106, 2015-Ohio-4347, 54 N.E.3d 80. In that case, the defendant was convicted of four counts of having weapons while under disability. Three of these convictions coincided with a theft, a drive-by shooting, and a murder, each committed on different dates. The fourth conviction related to the date the defendant was arrested. Noting the defendant's possession of a handgun on four separate occasions at different times and locations, the court held that the trial court did not commit plain error in failing to merge the offenses because "[e]ach offense occurred with a separate animus, meaning a separate purpose or intent. Thus, the 'same conduct' did not result in multiple convictions." *Id.* at ¶ 217.

{¶ 30} Upon consideration of the facts of the present case, we find that the trial court did not err in failing to merge appellant's convictions for having weapons while under disability. Indeed, the two offenses were separated by a period of four days and were thus committed separately. Further, the offenses were committed with a separate animus or motivation; the first offense was motivated by appellant's desire to rob the

13.

Valero store and the second offense was motivated by appellant's desire to rob the BP Stop & Shop store.

{¶ 31} Accordingly, appellant's second assignment of error is not well-taken.

### C. Prosecutorial Misconduct

{¶ 32} In his third assignment of error, appellant argues that the state committed prosecutorial misconduct during closing arguments.

{¶ 33} "The test for prosecutorial misconduct is whether remarks are improper and, if so, whether they prejudicially affected substantial rights of the accused." *State v. Lott*, 51 Ohio St.3d 160, 165, 555 N.E.2d 293 (1990). "[T]he touchstone of due process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor." *Id.* at 166, quoting *Smith v. Phillips*, 455 U.S. 209, 219, 102 S.Ct. 940, 71 L.Ed.2d 78 (1982). Where there are improper remarks, "it must be clear beyond a reasonable doubt that, absent the prosecutor's comments, the jury would have found defendant guilty." *State v. Smith*, 14 Ohio St.3d 13, 15, 470 N.E.2d 883 (1984).

{¶ 34} Appellant alleges two instances of prosecutorial misconduct. "The prosecution is normally entitled to a certain degree of latitude in its concluding remarks." *Id.* at 13. While it is not permissible for the state to vouch for the credibility of a witness, *State v. Jackson*, 107 Ohio St.3d 53, 2005-Ohio-5981, 836 N.E.2d 1173, ¶ 117, the state may respond to defense counsel's attacks on a witness's credibility by arguing that the witness was reliable and referring to facts in evidence that tend to make the witness more credible. *Id.* at ¶ 120.

14.

{¶ 35} First, appellant claims that the state improperly vouched for Tucker's credibility by telling the jury that Tucker was telling the truth during her testimony at trial. Specifically, appellant takes issue with the following statements made during closing arguments:

You heard Jamika Tucker, 21-year-old girl. Because of [appellant], she's now a convicted felon. She pled to a robbery and is facing up to eight years in prison because of him. You will hear about, oh, what a benefit, oh, what a bargain. Eight years in prison is no bargain to me. She came and told you the truth. She told you what happened, and after a barrage of questions, dirtying her up, prior employment, loss of her children, she told you the truth. She didn't sugar coat it, she didn't deny it. As unsavory as it was, unflattering as it was, she still told you the truth. And no one is going to ask you to like her. Going to ask you to listen to her and decide if she is telling the truth. She said that this guy, Christopher Tally, robbed both of those stores with her. He was the driving force.

* * *

So, we're going to ask you, again, to look at Jamika Tucker. You promised, if believed, you could convict on her word alone, but there is a lot more evidence to support her. Remember, a 21-year-old girl with two babies, timid, low self-esteem, overborne by him. He threatened to put her out of her very own house. You may just hate the fact, I don't get it, I don't know why she would smoke marijuana while she was pregnant, you may

even hate that. It doesn't make her a liar. Unfortunately, it's all over the place. Heck, it's going to be even on a ballot initiative to make it legal in Ohio. I don't understand it, but that's what she's around all the time. You may hate the fact that she was behind on rent. So what. That doesn't make her a robber. Well, it makes her a robber. It doesn't make her a liar is what I meant to say. She lost some jobs. It doesn't make her a liar. She sat in front of you and told you some real unflattering things about herself. She didn't lie. She explained what happened. She was supported by the evidence, the 911 calls, and the videos from the store, and the witnesses that were called supported her. She said that the defendant was the gunman and the evidence supports it.

**{¶ 36}** In general, these statements were made in response to defense counsel's attack on Tucker's truthfulness during trial. These attacks formed the basis for defense counsel's chief defense at trial, which attempted to cast doubt upon Tucker's identification of appellant as the gunman. The state, in response, relied upon facts in evidence that tended to bolster Tucker's credibility in order to support its assertion that Tucker was telling the truth. This is not improper vouching. *Jackson* at ¶ 120.

**{¶ 37}** We do note, however, that it was improper for the state to tell the jury that Tucker "told the truth" and "didn't lie." *See State v. Thomas*, 2d Dist. Clark No. 2000-CA-43, 2001 Ohio App. LEXIS 4226, *22 (Sep. 21, 2001) ("In other words, a prosecutor cannot say, 'I believe my witnesses told the truth,' but he can say, 'other evidence demonstrates my witnesses told the truth.'"). Nevertheless, given the unrefuted evidence

16.

presented by the state at trial, we find that it is clear beyond a reasonable doubt that, absent the state's comments, the jury would have found defendant guilty. In that regard, we find that the state's misconduct was "an isolated incident in an otherwise properly tried case," *State v. Keenan*, 66 Ohio St.3d 402, 410, 613 N.E.2d 203 (1993), which did not deprive appellant of a fair trial.

{¶ 38} Second, appellant challenges the state's argument at closing wherein the state told the jury:

> The armed robber has a black stocking cap down covering his head, and very prominent dark facial hair, just like [appellant] had before he shaved it. And yes, indeed Mr. Fouad wasn't asked to identify this Defendant, and there is a very good reason; he changed his look before trial. And when [defense counsel] talks about a right for confrontation, it is his right. [Appellant] didn't ask either, did he?
>
> Larry Roberts, he wasn't asked to identify because the armed robber was covering his face the whole time with a black glove, so as to cover up his chin and his mustache because Mr. Roberts had seen him before. That's why Mr. Roberts wasn't asked to identify this Defendant.

Appellant argues that this comment improperly implied that defense counsel did not ask Fouad or Roberts to identify appellant as the gunman at trial because he did not believe appellant was innocent.

{¶ 39} In support of his argument, appellant cites the Supreme Court of Ohio's decision in *Keenan*. In that case, the state told the jury during closing arguments that

17.

defense counsel's conduct showed that they were "not looking at this objectively. They are paid to do that. They are paid to get him off the hook." *Id.* at 405. Upon review of this statement, the Supreme Court of Ohio found that it was improper insofar as it "imputed insincerity to defense counsel, thus suggesting that they believed Keenan guilty." *Id.* The court was further troubled by the following comments made by the state during rebuttal: "Not once did they tell you their client was innocent. Not once did they tell you to find him not guilty." *Id.* at 406. The court expressed concern that the jury might be unduly persuaded to convict a defendant if they believe that "even the defendant's own advocates think him guilty." *Id.* Additionally, the court noted that the jury would be more likely to believe a prosecutor's suggestion that defense counsel is merely a "hired [gun]," given the prosecutor's position as an impartial representative of the state. *Id.*

{¶ 40} Having compared the comments made by the prosecution in *Keenan* to the comments made by the state in this case, we conclude that the state's comments here do not implicate the prejudicial concerns raised by the court in *Keenan*. In particular, we find that defense counsel's failure to question Fouad and Roberts on the identity of the gunman would not lead the jury to conclude that defense counsel believed appellant was guilty. When read in its proper context, it is clear that the state was simply responding to defense counsel's argument that Fouad and Roberts did not identify appellant as the gunman at trial by noting that defense counsel did not elicit any identification testimony from those witnesses when given the opportunity to do so. The connection between the state's comments and appellant's assertion that those comments led the jury to believe

18.

that defense counsel thought appellant was guilty is attenuated at best. Therefore, we find no impropriety in the state's comments.

{¶ 41} Having ascertained that appellant was not deprived of a fair trial on account of the state's assertions of Tucker's truthfulness at closing, and having concluded that the state's comments regarding the lack of identification testimony from Fouad and Roberts were not improper, we find appellant's third assignment of error not well-taken.

### D. Costs

{¶ 42} In his fourth and final assignment of error, appellant argues that the trial court erred in imposing the costs of confinement and appointed counsel.

{¶ 43} R.C. 2929.18(A)(5)(a)(ii) provides that a sentencing court may impose, as a financial sanction, "[a]ll or part of the costs of confinement * * * provided that the amount of reimbursement ordered under this division shall not exceed the total amount of reimbursement the offender is able to pay as determined at a hearing and shall not exceed the actual cost of the confinement." "Before imposing a financial sanction under [R.C. 2929.18], the court shall consider the offender's present and future ability to pay the amount of the sanction or fine." R.C. 2929.19(B)(6). We have held that a sentencing court is not required to hold a hearing when determining whether to impose a financial sanction under this provision. *State v. Phillips*, 6th Dist. Fulton No. F-05-032, 2006-Ohio-4135, ¶ 18, citing *State v. Lamonds*, 6th Dist. Lucas No. L-03-1100, 2005-Ohio-1219, ¶ 42. However, the record must contain some evidence that the court considered the offender's ability to pay such a sanction. *Id.*

19.

{¶ 44} The recovery of appointed counsel fees is governed by R.C. 2941.51(D), which provides that such fees "shall not be taxed as part of the costs and shall be paid by the county. However, if the person represented has, or reasonably may be expected to have, the means to meet some part of the cost of the services rendered to the person, the person shall pay the county an amount that the person reasonably can be expected to pay." Again, no hearing on this matter is expressly required, but the court must enter a finding that that the offender has the ability to pay and that determination must be supported by clear and convincing evidence of record. *State v. Knight*, 6th Dist. Sandusky No. S-05-007, 2006-Ohio-4807, ¶ 6-7.

{¶ 45} Here, the trial court did not conduct a separate hearing to determine appellant's ability to pay the costs of confinement or the costs of appointed counsel, but did enter a finding that appellant had the ability to pay. However, the state has not directed our attention to any fact in the record that would demonstrate appellant's ability to pay. Further, the presentence investigation report demonstrates that appellant, a 31-year-old man, did not graduate high school and has never been employed. According to the report, appellant has been supported by his family and friends for his entire life. Given these circumstances, it is difficult to imagine how appellant might be able to pay the imposed costs after being released from prison in 21 years as a 52-year-old convicted felon with no prior work experience or meaningful education.

{¶ 46} On this record, we find that the trial court's determination of appellant's ability to pay the costs of confinement and court appointed fees was not supported by

clear and convincing evidence.  Accordingly, appellant's fourth assignment of error is well-taken.

### III.  Conclusion

{¶ 47} On consideration whereof, the judgment of the Lucas County Court of Common Pleas is affirmed, in part, and reversed, in part.  The trial court's imposition of the costs of confinement and appointed counsel fees is hereby vacated, and the court's judgment is affirmed in all other respects.  It is ordered that appellee pay the costs of this appeal pursuant to App.R. 24.

Judgment affirmed, in part
and reversed, in part.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.


Mark L. Pietrykowski, J.                _____
                                                 JUDGE
Arlene Singer, J.

                                _____
Stephen A. Yarbrough, J.                                 JUDGE
CONCUR.

                                _____
                                                 JUDGE

21.