[Cite as *State v. Register*, 2025-Ohio-106.]

## COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

STATE OF OHIO,                          :

    Plaintiff-Appellee,            :

                                      No. 113757

    v.                              :

AMOUD REGISTER,                         :

    Defendant-Appellant.           :

---

### JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** January 16, 2025

---

Criminal Appeal from the Cuyahoga County Common Pleas Court
Case No. CR-23-684454-A

---

### *Appearances:*

Michael C. O'Malley, Cuyahoga County Prosecuting Attorney, and Christine M. Vacha, Assistant Prosecuting Attorney, *for appellee.*

Russell S. Bensing, *for appellant.*

ANITA LASTER MAYS, J.:

**{¶1}** Defendant-appellant Amoud Register ("Register") appeals his convictions and asks this court to remand the case for retrial, or vacate his sentence and remand for resentencing. We affirm Register's convictions and sentence.

{¶2} Register was found guilty of two counts of rape, in violation of R.C. 2907.02(A)(1)(b); two counts of complicity, in violation of R.C. 2923.03(A)(2); two counts of endangering children, in violation of R.C. 2919.22(B)(1); and four counts of sexual battery, in violation of R.C. 2907.03(A)(5). He was found not guilty of pandering obscenity involving a minor and tampering with evidence. Register was sentenced to life imprisonment with eligibility for parole after serving 60 years.

## I.    Facts and Procedural History

{¶3} On July 5, 2020, L.P. drove to the police station and confessed to having sex with her son, I.P., who was 13 years old at the time. L.P. told the police that her child's father was using the fact that he had proof of her sexual activity with her son to threaten her regarding custody of their child together. In L.P.'s confession, she did not disclose any information regarding Register and I.P.'s sexual relationship. L.P. pleaded guilty to two counts of rape and two counts of child endangerment and was sentenced to ten years in prison.

{¶4} In August of 2023, L.P. disclosed to the police that Register forced her to have sex with I.P. After L.P.'s sentencing, Register was charged with rape, complicity to rape, pandering obscenity, endangering children, sexual battery, tampering with evidence, and falsification.

### A.    L.P.'s Testimony

{¶5} At trial, L.P. testified that she went to the police station to confess to raping I.P. and to get help for her and her children. L.P. testified that Register

started forcing her to have sex with I.P. in August 2019. She stated that the first time it happened, she was awakened to find that I.P. was naked on top of her. According to L.P., I.P. was rubbing, groping, and touching her, and she was naked as well. I.P. was 12 years old at the time. L.P. claimed that I.P. put his penis inside of her. L.P. noticed that there was a phone on the windowsill, and she assumed the phone was recording them.

{¶6} L.P. got up from the bed to go to the bathroom. She noticed that Register was sitting on the couch, with no underwear on, masturbating. L.P. testified that Register told her to go back into the room and followed her back. L.P. got back in the bed and attempted to go to sleep. I.P. got into the bed, and they continued to have sex. L.P. testified that Register was watching them. When they were done, I.P. left the room, and Register and L.P. had sex.

{¶7} L.P. testified that she engaged in this sexual behavior because it was what Register wanted, and she was scared. About ten days later, L.P. left and went to Connecticut to stay with her father. She stayed for approximately nine months, until May 2020. L.P. testified that she did not have sex with I.P. while in Connecticut.

{¶8} While L.P. was in Connecticut, Register filed for emergency custody of his daughter, who was with L.P. L.P. returned to Ohio and moved in with Register. L.P. testified that while living with Register, he requested that she do a striptease for I.P., while Register watched. Several times, after the striptease, L.P. would have

sex with I.P., at Register's demand, while Register masturbated or directed them on what to do. L.P. testified that Register was instructing I.P. on how to have sex with her. L.P. further testified that she, Register, and I.P. would sometimes have threesomes, where she would take turns having sex with both Register and I.P.

{¶9} L.P. stated that she would perform oral sex on Register, and then Register would have I.P. perform oral sex on Register. L.P. testified that she did not know how many times the threesomes occurred, but recounted that they happened several times and often. L.P. also testified that the times she had sex with I.P., on her own, Register would record them, but she was not sure if he was actually recording their interactions.

{¶10} L.P. also stated that when she was done having sex with I.P. or done with the threesomes, she and Register would have sex, and then talk about the threesomes. L.P. also claimed that Register took a photo of her performing oral sex on I.P. because Register showed her the photo.

### B. I.P.'s Testimony

{¶11} At the time of the trial, I.P. was 17 years old. I.P. testified that Register was like a father, or a stepfather to him, and he was L.P.'s boyfriend. I.P. testified that the nature of the relationship with Register changed when I.P. was ten years old. I.P. stated that Register introduced him to pornography and taught him how to masturbate. I.P. testified that he vividly remembered Register bringing I.P. into Register's bedroom and pornography was on Register's television. I.P. testified

that the pornography showed a naked woman fingering herself. Register told I.P. that this was something he needed to learn eventually. I.P. did not tell anyone about this because he trusted Register as a father figure.

**{¶12}** I.P. testified that when he turned 11 years old, he and Register started masturbating together. I.P. also testified that he started having sex with L.P. around the same time. I.P. stated that he first watched his mother masturbate in their living room. Register was present. I.P. continued, stating that Register played a video on his laptop of L.P. masturbating, so he was used to seeing his mother sexually.

**{¶13}** I.P. testified that he was in a room playing video games when Register came and got him. Register took him to the living room, where L.P. was naked. L.P. asked I.P. what he wanted to see. I.P. responded with "I want to see you play with yourself." Tr. 604. L.P. masturbated while I.P. and Register watched. I.P. remembers being in 7th grade at the time. I.P. testified that it happened again, but this time I.P. and Register masturbated while watching his mother masturbate. Again, Register would get I.P. and take him into the room to watch L.P.

**{¶14}** I.P. then testified that eventually the encounters turned into threesomes where L.P. would perform oral sex on Register, and Register would instruct I.P. to put his penis in L.P.'s vagina. I.P. testified that this continued where it would start off with he and Register watching L.P. masturbate and then L.P.

would sit on his lap. L.P. would eventually put I.P.'s penis inside of her vagina. I.P. testified that Register was also present, watching them and masturbating.

{¶15} I.P. recalled having conversations with Register about the sexual encounters. Register told I.P. that it was a learning experience, and he was teaching I.P. I.P. testified that sexual encounters happened countless times, at least three to five times a week.

{¶16} I.P. further testified that he and L.P. did not have sex when they moved to Connecticut. He stated that L.P. told him it was never going to happen again because it happened at Register's prodding. However, when they moved back to Ohio, the threesomes started again.

{¶17} I.P. testified that L.P. and Register were sharing a bed. They would wake I.P. up and L.P. would perform oral sex on Register. I.P. would have sex with L.P. from behind. I.P. also testified that Register would physically touch I.P.'s penis. I.P. further testified that Register would make him lick his testicles and penis at least three times. Register would also lick I.P.'s penis and testicles. I.P. continued his testimony and stated that Register performed oral sex on him and he on Register before I.P. moved to Connecticut. He testified that they were alone in a room, and I.P. was uncomfortable with the interaction. However, it occurred a couple of times.

{¶18} I.P. testified that he did not initially tell the police about Register when they first came to interview him because he loved and cared about Register.

However, I.P. eventually told a social worker at the child advocacy center. I.P. then made a subsequent statement to the police. I.P. decided to make the disclosures after going to therapy. I.P. further testified that he had not had a conversation with his mother after she left the house to go to the police in July 2020. The only time he saw her after that was at her sentencing.

### C. Case Worker Christine Lee's Testimony

{¶19} Christine Lee ("Lee"), child protection specialist for the Cuyahoga County Division of Children and Family Services ("CCDCFS") testified that she was assigned to the case after a police officer called the child abuse hotline. Lee testified that she investigates allegations of abuse and neglect on children and has training in forensic interviewing and a degree in education. Lee testified that she interviewed I.P. at the police station after L.P.'s disclosures. Lee had two interviews with I.P., the second one at the child advocacy center. Lee testified that I.P.'s mental health therapist contacted her and, based on what I.P. revealed in therapy, asked Lee to conduct a second interview with I.P.

{¶20} Lee testified that during the second interview, I.P. made disclosures about the sexual involvement with Register. Lee was asked if she had interviewed other children who had been sexually abused, to which she answered in the affirmative. Then Lee was asked if it was uncommon for children to have multiple interviews with her, and Lee responded that it was not uncommon. Lee also

testified that it was not uncommon for children to disclose information in a subsequent interview that they did not disclose in the first.

{¶21} Register's trial counsel objected, stating that Lee's testimony was offering expert witness testimony under Evid.R. 702. However, the trial court responded that the question was pertaining to her personal experience as a case worker. The trial court overruled counsel's objection.

### D. Officer Harbeen Kaur Mileti's Testimony

{¶22} Officer Harbeen Kaur Mileti ("Ofc. Mileti") testified that L.P. initially made her disclosures to Ofc. Mileti about the sexual relationship between L.P. and I.P. L.P. told Mileti that she was involved in a custody dispute with Register, and he was using the fact that she was having sex with I.P. to control her with regards to custody of their daughter. Ofc. Mileti went to the shared home of L.P. and Register to interview Register, who was in the home. Register told Mileti that he took a photograph of I.P. and L.P. engaged in sexual activity. Register also stated that he would bring the photograph to the police station at a later time.

{¶23} Ofc. Mileti asked Register if he wanted to make a written statement. Register said that he would. Register was provided a statement form and an extra page for more details if he needed it. Register said that he would need more paper and that he would bring his statement to the police department. Register did not bring the statement or photo to the police.

### E. Lieutenant Christopher Swope's Testimony

**{¶24}** Lieutenant Christopher Swope ("Lt. Swope") testified that after L.P.'s disclosures at the police station, he went to Register's home to interview him. Register told Lt. Swope that he was aware of the sexual relationship between L.P. and I.P. and had tried to intervene, telling her it was wrong. Register also told Lt. Swope that he had a photo of L.P. and I.P. engaging in sexual activity. Register informed Lt. Swope that the photo was on a drive that was not at the residence. Lt. Swope asked Register to bring the photo to the police station later, but Register did not.

### F. Sentencing

**{¶25}** At the conclusion of the trial, the jury found Register guilty of rape, complicity, endangering children, and sexual battery. He was found not guilty of pandering obscenity involving a minor and tampering with evidence. Prior to the trial court sentencing Register, Register's trial counsel stated to the court: "Given that [L.P.] was given a total of ten years for her role in traumatizing this young man, we do think that when you look at offenders, similarly situated offenders, a sentence, a minimum sentence of ten years to life is sufficient at this Court — ." Tr. 988.

**{¶26}** The trial court replied: "My understanding — well, in comparison, what you are saying is comparison, the co-defendant pleaded guilty to a different

subsection of rape, two counts and then one count engage children.  Was there —

I don't believe there was agreed sentence."  Tr. 992.

{¶27} The State informed the trial court that I.P. asked for the maximum

for L.P.  The trial court replied:

> It would have been 30 years.  I recall my sentencing was — the reason
> why I gave her — the reason I gave her the sentence that I did at the
> time was due to the fact that because I had read and had all the
> information of what happened or what alleged to have happened as it
> relates to Mr. Register, I did read all the children and family services
> records and it did make me believe, just based upon that and what we
> know about human nature, that Mr. Register had a significant amount
> of control over [L.P.], even though [L.P.] would still need to account
> for her actions.
>
> The evidence that came in the end also confirmed that in which the
> driving force behind these acts was Mr. Register because they did not
> occur by all accounts while the victim and his family and mother were
> in Connecticut. And that Mr. Register not only — this was at the
> sentencing, but in the children family services records, not only had
> her have sex with her own son, but also with Mr. Register's other
> family members.  Of course, that was not at trial because at the same
> time that was excluded from this trial and the other case, co-
> defendant's case, never went to trial, but there was significant amount
> of evidence at sentencing that the — [L.P.] was under the defendant's
> directions doing these and when she was not under his direction, she
> had stopped these acts.

Tr. 993-994.

{¶28} The trial court sentenced Register to life imprisonment with

eligibility for parole after serving 60 years.  He filed this appeal, assigning five

errors for our review:

1.   The trial court erred in entering convictions which were against
     the manifest weight of the evidence, in derogation of

defendant's rights to due process of law, as protected by the Fifth and Fourteenth Amendments to the United States Constitution;

2. The trial court in permitting the State to introduce testimony that defendant had failed to make statement, in derogation of defendant's rights under the Fifth and Fourteenth Amendments to the United States Constitution;

3. The trial court erred in permitting the prosecutor to engage in misconduct, in derogation of defendant's rights under the Fifth and Fourteenth Amendments to the United States Constitution;

4. The trial court erred in permitting testimony about delayed disclosure of a sexual abuse victim; and

5. The trial court erred in considering uncharged conduct in sentencing the defendant.

## II. Manifest Weight of the Evidence

### A. Standard of Review

{¶29} When reviewing a manifest-weight challenge, an appellate court, "'weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.'" *State v. Virostek*, 2022-Ohio-1397, ¶ 54 (8th Dist.), quoting *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist.1983). A reversal on the basis that a verdict is against the manifest weight of the evidence is granted "'only in the exceptional case in which the evidence weighs

heavily against the conviction.'" *State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997), quoting *Martin* at 175.

**{¶30}** "The criminal manifest weight-of-the-evidence standard addresses the evidence's effect of inducing belief." (Cleaned up.) *State v. Kemp*, 2024-Ohio-1276, ¶ 31 (8th Dist.). "Under the manifest weight-of-the-evidence standard, a reviewing court must ask the following question: whose evidence is more persuasive — the state's or the defendant's?" (Cleaned up.) *Id.* "Although there may be legally sufficient evidence to support a judgment, it may nevertheless be against the manifest weight of the evidence." (Cleaned Up.) *Id.* "When a court of appeals reverses a judgment of a trial court on the basis that the verdict is against the manifest weight of the evidence, the appellate court sits as a 'thirteenth juror' and disagrees with the factfinder's resolution of the conflicting testimony." (Cleaned up.) *Id.*

### B. Law and Analysis

**{¶31}** In Register's first assignment of error, he argues that his convictions are against the manifest weight of the evidence because L.P. and I.P.'s testimony were inconsistent. He contends that L.P. and I.P. testimony differ as to when the sexual intercourse between them started. Also, Register argues that some of the stories regarding the specific details about the sexual experiences differ.

**{¶32}** "'[A] defendant is not entitled to reversal on manifest weight grounds merely because certain aspects of a witness' testimony are inconsistent or

contradictory.'" *State v. Parke*, 2023-Ohio-1144, ¶ 15 (8th Dist.), quoting *State v. Flores-Santiago*, 2020-Ohio-1274, ¶ 40 (8th Dist.). *See, e.g., State v. Nitsche*, 2016-Ohio-3170, ¶ 45 (8th Dist.); *see also State v. Wade*, 2008-Ohio-4574, ¶ 38 (8th Dist.) ("A conviction is not against the manifest weight of the evidence solely because the [factfinder] heard inconsistent testimony."); *see also State v. Mann*, 2011-Ohio-5286, ¶ 37 (10th Dist.) ("While [a factfinder] may take note of the inconsistencies and resolve or discount them accordingly . . . such inconsistencies do not render defendant's conviction against the manifest weight or sufficiency of the evidence.").

**{¶33}** "'It is well settled, however, that the credibility of witnesses is a matter for the trier of fact to determine.'" *Id.* at ¶ 16, quoting *State v. Miller*, 2019-Ohio-5024, ¶ 21 (5th Dist.). "'Challenges to the sufficiency of the evidence based upon instances of inconsistent testimony, memory defects, and the like are witness credibility issues which are properly resolved by the trier of fact.'" *Id.*, quoting *State v. Nichols*, 2013-Ohio-3898, ¶ 13 (5th Dist.).

> Although we consider the credibility of witnesses in a manifest weight challenge, we are mindful that the determination regarding witness credibility rests primarily with the trier of fact because the trier of fact is in the best position to view the witnesses and observe their demeanor, gestures, and voice inflections — observations that are critical to determining a witness's credibility.

*Id.*, quoting *State v. Jackson*, 2014-Ohio-3583, ¶ 37 (8th Dist.), citing *State v. Clark*, 2010-Ohio-4354, ¶ 17 (8th Dist.).

**{¶34}** "The trier of fact is free to accept or reject any or all the testimony of any witness." *Id.* at ¶ 17, citing *State v. Smith*, 2010-Ohio-4006, ¶ 16 (8th Dist.). *See State v. Rodenberger*, 2020-Ohio-6979, ¶ 65 (6th Dist.) (Any inconsistencies between testimonies of witnesses does not render the verdict improper.) "[I]t is well-established that 'a conviction is not against the manifest weight of the evidence solely because the jury heard inconsistent testimony." *State v. Talley*, 2016-Ohio-8010, ¶ 23 (6th Dist.), citing *Wade*, 2008-Ohio-4574, ¶ 38 (8th Dist.).

**{¶35}** We do not agree with Register's assertions. L.P. and I.P. both testified that they were involved sexually with one another as well as with Register. I.P. also testified to participating in sexual acts with Register, outside of the presence of L.P. The jury was in the best position to determine I.P. and L.P.'s credibility. Here, we cannot say that the jury lost its way in resolving conflicting testimony.

**{¶36}** Therefore, Register's first assignment of error is overruled.

## III. Improperly Admitted Evidence

### A. Standard of Review

**{¶37}** "We use a de novo standard of review to assess errors based upon violations of constitutional law." *State v. Bryant*, 2014-Ohio-5535, ¶ 12 (4th Dist.), citing *State v. Burgette*, 2014-Ohio-3483, ¶ 10 (4th Dist.).

### B. Law and Analysis

**{¶38}** In Register's second assignment of error, he argues that the trial court erred in permitting testimony that he failed to bring his written statement about

L.P. and I.P.'s sexual relationship to the police. Register cites the Supreme Court's decision in *State v. Leach*, 2004-Ohio-2147, to support his assertion that the testimony is improper. However, the facts in *Leach* are not analogous to the facts in this case. In *Leach,* the defendant contacted the police department and made an appointment to speak with the police at the station. The defendant did not keep the appointment and instead told police that he wanted to speak to an attorney. Later, the police arrested the defendant and brought him to the station. He signed a *Miranda* form at the station, he answered some questions, and then stated that "he wished to consult an attorney." *Id*. at ¶ 7. The State requested that the form be admitted into evidence. The defense objected, arguing that the form had no relevance. The trial court overruled the objection and stated that the State was required to use the form because Leach had invoked his constitutional right to speak to an attorney. The trial court also stated that admission of the form was harmless beyond a reasonable doubt.

{¶39} The Supreme Court in *Leach* held that "the use of a defendant's pre-arrest silence as substantive evidence of guilt violates the Fifth Amendment privilege against self-incrimination." *Id*. at ¶ 38. Because the evidence of guilt was not overwhelming in the case, the admission of defendant's prearrest, pre-Miranda silence was clearly prejudicial. *Id*.

{¶40} However, in our instant case, the police went to Register's home to get more information concerning L.P.'s disclosures, who had not accused him of

being involved. Register volunteered to the police that he had a photograph of L.P. and I.P. and then volunteered to write a statement and bring both the photograph and the statement to the police. There is no evidence that the testimony was used as substantive evidence of Register's guilt. This is not a Fifth Amendment issue because at the time Register was not being accused or charged with a crime. The Supreme Court in *Leach* specifically held that if the defendant's pre-arrest silence is used as substantive evidence of guilt, then it violates the defendant's rights against self-incrimination. Register fails to demonstrate how the State used this fact as substantive evidence.

{¶41} Therefore, Register's second assignment of error is overruled.

## IV. Inadmissible Evidence

### A. Standard of Review

{¶42} "'The admissibility of other-acts evidence pursuant to Evid.R. 404(B) is a question of law.'" *State v. Marshall*, 2021-Ohio-4434, ¶ 44 (8th Dist.), quoting *State v. Hartman*, 2020-Ohio-4440, ¶ 22. "'Determining whether the evidence is offered for an impermissible purpose does not involve the exercise of discretion . . . [therefore] an appellate court should scrutinize the [trial court's] finding under a de novo standard' of review." *Id.*, quoting *id.*, quoting Leonard, The New Wigmore: *Evidence of Other Misconduct and Similar Events*, § 4.10 (2d Ed.2019).

{¶43} "'[T]he trial court is precluded by Evid.R. 404(B) from admitting improper character evidence, but it has discretion whether to allow other-acts

evidence that is admissible for a permissible purpose.'" *Id.* at ¶ 45, quoting *id.*, citing *State v. Williams*, 2012-Ohio-5695, ¶ 17. "If the reviewing court finds that the evidence was admitted for a permissible purpose, this court should not disturb [that decision] in the absence of an abuse of discretion that created material prejudice." (Cleaned up.) *Id.*

## B. Law and Analysis

{¶44} In Register's third assignment of error, he argues that the trial court erred in allowing the State to introduce evidence of other crimes in violation of Evid.R. 404(B), which provides, in part: "(1) Prohibited uses. Evidence of any other crime, wrong or act is not admissible to prove the person's character in order to show that on a particular occasion the person acted in accordance with the character."

{¶45} During I.P.'s testimony, the State asked about I.P.'s relationship with Register. I.P. testified that his relationship with Register started off as a father-son relationship. I.P. testified that the nature of the relationship with Register changed when I.P. was ten years old. I.P. stated that Register introduced him to pornography and taught him how to masturbate. Register contends that this testimony was propensity evidence and used by the State to persuade the jury that if Register would do what he was not charged with, he would do what he was charged with.

**{¶46}** We determine that I.P.'s testimony was not offered as propensity evidence, but rather to explain when the nature of the relationship changed between I.P. and Register. The State did not explain or even illicit testimony that demonstrated if Register was guilty of showing pornography, then he was guilty of raping I.P. "'[W]hile evidence showing the defendant's character or propensity to commit crimes or acts is forbidden, evidence of other acts is admissible when the evidence is probative of a separate, nonpropensity-based issue.'" *Marshall*, 2021-Ohio-4434, at ¶ 51, quoting *Hartman*, 161 Ohio St.3d 214 at ¶ 22.

**{¶47}** "In determining the admissibility of other acts evidence, we must determine whether the evidence is relevant." *Id*. at ¶ 52, citing *id*. at ¶ 24. "The issue with other acts evidence, however, is that propensity evidence will almost always have some relevance." *Id*., citing *id*. at ¶ 25. "Propensity evidence is excluded 'not because it has no appreciable probative value but because it has too much.'" *Id*., quoting *id*., citing 1A Wigmore, *Evidence,* § 58.2, at 1212 (Tillers Rev. 1983).

**{¶48}** Therefore, when it comes to other acts testimony, the question is not "'whether the other-acts evidence is relevant to the ultimate determination of guilt. Rather, the court must evaluate whether the evidence is relevant to the particular purpose for which it is offered.'" *Id*. at ¶ 53, quoting *id*. at ¶ 26. "Further, 'the nonpropensity purpose for which the evidence is offered must go to a material issue that is actually in dispute between the parties.'" *Id*., quoting *id*. at ¶ 27. "Not

only must the evidence go to a material issue, but there must be 'a threshold showing that the act for which the evidence is offered actually occurred. . . . and that the defendant was the actor.'" *Id.*, quoting *id.* at ¶ 28.

{¶49} The purpose for I.P.'s testimony about Register showing him pornography was to give a timeline of when the relationship between Register and I.P. changed from a father-son relationship to a sexual one. The State did not demonstrate the purpose was to show that if Register shows pornography, then he would rape and engage in threesomes with I.P. The jury found Register not guilty of pandering obscenity involving a minor and tampering with evidence. This demonstrates that the evidence was not used as propensity evidence.

{¶50} Therefore, Register's third assignment of error is overruled.

## V. Delayed Disclosure Evidence

### A. Standard of Review

{¶51} The admission or exclusion of evidence is within the purview of the trial court, and we review these decisions for an abuse of discretion. *State v. Hughes*, 2021-Ohio-2764, ¶ 39 (8th Dist.). An abuse of discretion occurs if a court exercises its judgment in an unwarranted way regarding a matter over which it has discretionary authority. *Johnson v. Abdullah*, 2021-Ohio-3304, ¶ 35.

### B. Law and Analysis

{¶52} In Register's fourth assignment of error, he argues that the trial court erred by permitting Lee to testify that it is common for her to conduct more than

one interview with a child. When asked if it was uncommon that Lee have information in the first interview that you may not have in a second interview or vice versa, Lee responded with "correct." Tr. 699. Register contends that Lee lacked the education and credentials of a social worker, so she should not have been allowed to testify on delayed disclosures as an expert social worker.

{¶53} Register's assertions are misplaced. Lee was not testifying as a social worker. She was testifying about her personal experience. *See State v. Belle*, 2019-Ohio-787, ¶ 48 (8th Dist.) ("The state had laid a foundation demonstrating that she [the nurse] had a sufficient amount of experience and training and her testimony here was based on her personal knowledge and experience."); *State v. Andre*, 2015-Ohio-17, ¶ 25 (8th Dist.) (Evid.R. 701 requires that any opinion offered by a lay witness be rationally based on firsthand perceptions by the witness to be admissible.). Lee was permitted to testify about her personal experiences. She was not testifying as an expert witness concerning delayed disclosures in general, but specifically about her experiences with taking statements and counseling children. *See, e.g., State v. Bright*, 2024-Ohio-2803, ¶ 22 (8th Dist.) (The SANE nurse's testimony was permissible lay-witness testimony because the State laid a foundation demonstrating her testimony was based on her personal knowledge and experience.).

{¶54} Therefore, Register's fourth assignment of error is overruled.

## VI. Improper Sentencing

## A. Standard of Review

{¶55} We review felony sentences under the standard set forth in R.C. 2953.08(G)(2). *State v. Marcum*, 2016-Ohio-1002, ¶ 16. R.C. 2953.08(G)(2)(a) compels appellate courts to modify or vacate sentences if they find by clear and convincing evidence that the record does not support any relevant findings under division (B) or (D) of section 2929.13, division (B)(2)(e) or (C)(4) of section 2929.14, or division (I) of section 2929.20 of the Revised Code.

## B. Law and Analysis

{¶56} In Register's fifth assignment of error, he argues that the trial court erred in considering uncharged conduct in sentencing him. At sentencing, Register's trial counsel asked the trial court to sentence Register to ten years in prison, like L.P. In response, the trial court explained to counsel why L.P. received a ten-year sentence. The trial court referred to L.P. being under the control of Register, self-reporting her crime, and the fact that, while under Register's control, L.P. engaged in sexual acts with Register's family member.

{¶57} Register contends that the information regarding forcing L.P. to have sex with his family members was admitted into evidence and he was not charged for that crime. Thus, it was improper for the trial court to consider it when sentencing him. "Our court has consistently held that it is error for a trial judge to base a sentence upon a crime neither charged nor proven." *State v. Williams*, 2002-Ohio-503, ¶ 22 (8th Dist.). However, in sentencing Register, the trial court

did not mention the sexual acts with Register's family members. The trial court only mentioned it when explaining why it gave L.P. a ten-year sentence in prison.

**{¶58}** Register's assertions are misplaced. The record does not reflect that the trial court used the unindicted act as the basis for its sentence. It was only mentioned in reference to L.P.'s sentence. In sentencing Register, the trial court stated:

> So I've considered the factors concerning sentencing and the recidivism or the conduct that's less likely, I don't think there's any grounds or any of the factors that would tend to lessen the seriousness of these crimes. I think it's been said by multiple parties during this trial that out of all the rape cases, this is one of the worst that we've seen. The victim suffered serious physical, psychological harm, that the victim's age is a huge factor, the fact that the defendant was in a position of trust over the victim. He does have a record as well, but I'll just say that all of these in separate instances are separate and continuous harm. These specific instances are only some of what the victim had to endure because, according to the victim how many times this happened, multiple times per week, and — it would be almost prohibitively wrong, and therefore, the State was able to put these into ranges so the testimonies that came in was it wasn't just one or two single solitary instances of rape. This was a house of horrors for the victim to the point where he believed that this was life, that this is how a person should act.

Tr. 995-996.

**{¶59}** The trial court did not improperly consider uncharged conduct when sentencing Register. Therefore, Register's fifth assignment of error is overruled.

**{¶60}** Judgment affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution. The defendant's conviction having been affirmed, any bail pending is terminated. Case remanded to the trial court for execution of sentence.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.


_____
ANITA LASTER MAYS, JUDGE

MARY J. BOYLE, J., CONCURS;
KATHLEEN ANN KEOUGH, P.J., CONCURS IN JUDGMENT ONLY