[Cite as *State v. Finnerty*, 2025-Ohio-5260.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
OTTAWA COUNTY

State of Ohio                                        Court of Appeals No. OT-24-032

    Appellee                                      Trial Court No. 23 CR 0248

v.

Michael Finnerty                                **DECISION AND JUDGMENT**

    Appellant                                      Decided:  November 21, 2025

* * * * *

Brian A. Smith, Esq., attorney for appellant.

James J. VanEerten, Esq., Ottawa County Prosecutor and
Barbara Gallé Rivas, Esq., Assistant Prosecutor for appellee.

* * * * *

**DUHART, J.**

{¶ 1} This is an appeal by appellant, Michael Finnerty, from the June 26, 2024

judgment of the Ottawa County Court of Common Pleas.  For the reasons that follow, we

affirm the trial court's judgment.

**{¶ 2}** Finnerty sets forth four assignments of error:

I. Appellant's conviction for Gross Sexual Imposition was not supported by sufficient evidence.

II. Appellant's conviction for Gross Sexual Imposition was against the manifest weight of the evidence.

III. The trial court abused its discretion in allowing the State to introduce the letter Appellant wrote to the trial court into evidence, in violation of Appellant's right to Due Process under the Fourteenth Amendment to the United States Constitution and Article I, Section 16 of the Ohio Constitution.

IV. The trial court committed plain error in ordering Appellant to pay $1,855.48 in restitution, in violation of Appellant's right to Due Process under the Fourteenth Amendment to the United States Constitution and Article I, Section 16 of the Ohio Constitution.

## Background

**{¶ 3}** The following facts are not in dispute. On Friday, August 25, 2023, eight friends gathered for a joint bachelor/bachelorette party at a three-bedroom Airbnb house ("the house") in Port Clinton, Ottawa County, Ohio. The friends included three couples: the bachelor and bachelorette; the bachelor's sister and her husband; and the bachelorette's friend, Autumn, and Autumn's boyfriend, Nick. Also present were the bachelor's best friend, Finnerty, and the bachelorette's friend, M.L. All of the friends, except Finnerty, arrived at the house by about 7:00 p.m., and socialized and drank alcohol. Finnerty was dropped off at the house by a co-worker at around 9:00 p.m.; he socialized and drank alcohol. Finnerty's wife had intended to join the gathering that Friday, but a babysitter for the couple's child was unavailable, so the wife planned to

meet up with Finnerty and the group of friends at the house on Saturday then go to Put-In-Bay.

{¶ 4} Shortly after Finnerty arrived, one couple left and brought back pizza to the house. After the eight friends ate pizza and drank, they left the house and were picked up by a van which took them to a local bar. They arrived at the bar at about 10:30 p.m. and the friends divided up - the men went outside while the women stayed inside. M.L. bought the women a round of shots and the men were outside drinking. Eventually, the women joined the men outside who were sitting at a picnic-type table; Finnerty and M.L. sat next to each other and the friends continued to drink until the bar closed, around midnight. The friends left that bar and walked for 20-30 minutes or so to another bar. Along the walk, Finnerty and M.L. were next to each other, talking, at the rear of the group. At the next bar, M.L. went into the bathroom, as she was not feeling well, and the other friends got drinks. The group only stayed at the second bar for a short time before they left and walked back to the house.

{¶ 5} At the house, M.L. made macaroni and cheese for the group while the other friends drank and played a game. At approximately 2:00 a.m., each of the three couples went to a bedroom to go to sleep, while M.L. and Finnerty went outside to smoke. After smoking, they came into the house. The plan was for M.L. to sleep in a bed in the basement and Finnerty to sleep on a couch on the first floor. Finnerty wanted a blanket, which was in the basement, so he followed M.L. down to the basement and noticed there were two beds; M.L. took one bed, Finnerty took the other bed.

3.

{¶ 6} M.L. was lying in her bed while Finnerty played around with the tv for a short while before he turned it off and went to his bed. Finnerty left his bed and went over and laid next to M.L. in her bed. Finnerty reached under M.L.'s shirt and felt her left breast while he masturbated and ejaculated on her leg. Finnerty got up, went upstairs to the bathroom, then went to the couch in the living room and fell asleep. M.L. texted Autumn at 2:56 a.m., asking if Autumn was awake. Next, M.L. got out of her bed and went upstairs to the bedroom where Autumn and Nick were sleeping. Thereafter, Autumn called 911 and the police arrived at the house at about 4:00 a.m. Initially, the police talked to Autumn and M.L., then M.L. was taken to the hospital by Nick and Autumn. The police woke up Finnerty, spoke with him and arrested him.

{¶ 7} In September 2023, Finnerty was indicted on three offenses: sexual battery, gross sexual imposition ("GSI") and rape.

{¶ 8} In April 2024, the trial court received a letter written by Finnerty to the trial judge.

{¶ 9} A jury trial commenced on May 7, 2024. On May 10, 2024, the jury found Finnerty not guilty of sexual battery and rape, but guilty of GSI, in violation of R.C. 2907.05(A)(5), which provides that "[n]o person shall have sexual contact with another . . . when . . . [t]he ability of the other person to resist or consent . . . is substantially impaired because of a mental or physical condition . . . , and the offender knows or has reasonable cause to believe that the ability to resist or consent of the other person . . . is substantially impaired because of a mental or physical condition . . ."

4.

{¶ 10} A sentencing hearing was held and Finnerty was sentenced to 18 months in prison, ordered to register as a Tier I sex offender and pay $1,855.48 in restitution to M.L. Finnerty appealed.

{¶ 11} In addition, to the foregoing undisputed facts, there are facts in dispute. The different versions of those disputed events follow, in the order in which the witnesses testified at trial.

**Autumn**

{¶ 12} Autumn testified she felt moderately buzzed while at the first bar, and she thought M.L. was too; no one in the group was drunk. When the ladies went outside at the first bar, M.L. sat down next to Finnerty because that was the only seat available.

{¶ 13} On the walk from the first bar to the second bar, M.L. and Finnerty were in the back of the group talking. M.L. was a slow walker. While walking, Finnerty went out onto the street and came back into M.L. - he was ramming his body into her on and off, like joking - and M.L. was a little annoyed. On the walk from the second bar to the house, Autumn did not see any swerving.

{¶ 14} When Autumn went to bed around 2:30-2:45 a.m., she did not notice any flirting between Finnerty and M.L.

{¶ 15} At about 3:00 a.m., Autumn was awoken by M.L. who was sobbing, trying to catch her breath and almost having a panic attack. M.L. told Autumn that she, M.L., woke up from a bad dream. M.L. said she woke up from a dead sleep to Finnerty on top of her, he was running his penis near her vaginal area, she felt something warm and

5.

sticky on her leg and he was telling her to roll over.  Autumn said M.L. was terrified of where Finnerty was.  Autumn woke up her boyfriend, Nick, turned on the lights and saw ejaculate on M.L.'s shorts and legs.

{¶ 16} The police were called, they arrived and after speaking with the police, M.L. decided to go to the hospital to have a rape kit done.

**Nick**

{¶ 17} Nick testified that on the walk from the second bar to the house, M.L. and Finnerty were extremely far behind the rest of the group, and M.L. and Finnerty were bumping into each other, which Nick would not describe as flirtatious.  By the time they arrived at the house, M.L. seemed almost sober and Finnerty was not extremely drunk, but Nick could tell Finnerty "was feeling it."

{¶ 18} Nick went to bed at about 2:45 a.m. and was subsequently shaken awake by Autumn, who told him that Finnerty raped M.L.  Nick heard M.L. crying and said she was so upset and freaked out that she was hyperventilating and almost hysterical.

**Bachelorette**

{¶ 19} The bachelorette testified that she went to sleep at about 1:30 - 2:00 a.m., and the next thing she remembered was Autumn kneeling by the bed trying to wake her. The two women went downstairs where M.L. was on the floor of Autumn and Nick's bedroom bawling and almost hysterical and "[y]ou couldn't get her to calm down." Eventually, M.L. could talk and she said she was smoking a cigarette outside on the porch

6.

and Finnerty was outside smoking with her, after which she went inside and down in the basement and Finnerty followed her and noticed another bed down there. Finnerty turned on the tv and M.L. asked him if he was going to leave it on, but he turned it off and M.L. went to sleep. When M.L. woke up, Finnerty was on top of her, he had her shorts and underwear pulled down, he was rubbing his penis against her vagina and ejaculated on her legs, and he was telling her to turn over.

**M.L.**

{¶ 20} M.L. testified that on Friday night, everyone had pizza and drinks and decided to go out to the bars, but nothing too crazy since the group was going to Put-In-Bay on Saturday morning. By the time the group left the house to go to the first bar, M.L. had drunk three White Claw seltzers. M.L. denied touching Finnerty when she was sitting next to him at the first bar. She had a shot and two White Claws to drink at the first bar and had no more alcohol that night.

{¶ 21} While walking down the sidewalk from the first bar to the second bar, M.L. and Finnerty were behind the group and Finnerty "went wide first, like stagger[ed] out, and then he came in and would knock into" M.L. which caused her to stumble a little bit. Finnerty kept apologizing, saying he was drunk; M.L. "thought it was really weird" and she did not want him walking next to her.

{¶ 22} On the walk from the second bar to the house, Finnerty talked to M.L. about his work.

7.

{¶ 23} Back at the house, before going to bed, M.L. went outside, sat on a bench, and smoked. Finnerty went outside too, sat on a chair and smoked. Finnerty was talking about his wife and kid, how it was really weird not being with them because he is used to having his child sleep in between him and his wife every night. M.L. talked about her nephew and described the conversation as casual, not flirtatious.

{¶ 24} After smoking, M.L. "was ready for bed." She locked up the house and went to the basement, followed by Finnerty who wanted a blanket. He said there's another bed; he can sleep in that one. M.L. thought it was "awkward" and "weird," but she "didn't want to create a ruckus," so she told him he could sleep in the smaller bed. M.L. got into the bigger bed, turned off the light; Finnerty turned on the tv, then turned it off pretty quickly. M.L. was "immediately out." She believed it was about 2:00 to 2:30 a.m.

{¶ 25} M.L. heard a faint voice say, "turn over" and thought she "was dreaming or imagining things," so she went back to sleep. She then woke up with Finnerty on top of her with her shorts and underwear pulled down on the lower left side of her leg to above her knee. Finnerty had his hand under M.L.'s shirt, her bra was pushed up on her left breast, and he was squeezing her left breast while "rubbing and thrusting" his penis between her labia. M.L. was terrified and "was trying to figure out what to do. How to stop." She wanted to scream but could not get the air to scream. She thought about running, but Finnerty was on top of her, so she thought the "safest bet" was to pretend she was asleep. Next, he ejaculated on her pelvic region and leg, got up and went upstairs.

8.

The sexual encounter was against M.L.'s will, and she did not consent to sexual contact or conduct with Finnerty.

{¶ 26} M.L. grabbed her phone and texted Autumn to see if she was awake; it was about 2:56 a.m. M.L. then went up to Autumn and Nick's bedroom, crying hysterically, and told them what occurred.

**Finnerty**

{¶ 27} Finnerty testified that at the first bar, when the women joined the men outside, M.L. sat next to him. At one point, she put her hand on his leg and "just kind of smiled" at him, which he took as flirting. Later, when the group went from the first bar to the second bar, Finnerty walked with M.L. because she was walking by herself and he "just felt like she didn't need to be." Finnerty and M.L. were talking and flirting back and forth and he was bumping into her because he was intoxicated and she was also bumping into him, which was flirting. Finnerty was talking about his wife and child. He was also telling jokes, and she was laughing, which he guessed was flirting.

{¶ 28} At the second bar, Finnerty ordered a beer and a shot. He was drinking pretty heavily by this point, and he thought the bachelor was too. The group left the bar and as they were walking back to the house, Finnerty was trying to talk to two of the guys and was staggering and bumping into them. Finnerty thought the guys got tired of him bumping into them, so Finnerty fell back and was walking with M.L. He was bumping into M.L. because he was "having a tough time walking . . . [as he was] pretty drunk."

9.

The two were flirting and he apologized for bumping into her but M.L. did not seem too bothered by it and she was bumping into him too.

{¶ 29} At the house, after drinking and playing a game, everyone was kind of tired, but Finnerty still wanted to stay up and have some drinks. The three couples went to their bedrooms and M.L. went outside to smoke, so Finnerty said, "I have [M.L.] to smoke with, so I'll go out and smoke with her." The two went outside and smoked, after which they went back inside. Finnerty asked M.L. if there was a blanket somewhere and M.L. said there was one in the basement, and she would get it. He followed her to the basement, saw two beds and asked M.L. if she would mind if he slept on the second bed; she said she did not mind. They got into separate beds, and he asked if she minded if he watched tv, she said no. He started to mess around with the tv, trying to get Netflix to work, but he did not know the login information, so he turned off the tv.

{¶ 30} Finnerty ended up in M.L.'s bed - he walked over to her bed and crawled in bed with her. He did not know whether she was asleep or not, but he thought she was still awake because "it was only a couple minutes afterwards." He was not on top of her, he was on his side and next to her, where her leg was. He reached his hand under her shirt and bra, grabbed her left breast, he had his genitals out and he started to masturbate. At that time, her shorts were up - he did not remove her pants or underwear. He believed she wanted him to be in bed with her and that she was still awake, although he acknowledged that he did not say anything to her, she did not say anything to him, and she did not react in any way nor do anything affirmatively that would have made him

10.

believe that she wanted him to grope her left breast and lay next to her and masturbate. Finnerty ejaculated on M.L.'s leg, got up and went upstairs, used the bathroom then fell asleep on the couch. He felt awful afterward because he felt like he betrayed his wife.

{¶ 31} Finnerty woke up to a light in his eyes, with the police asking if he remembered anything in the last two hours, but he said no. He was terrified that he was going to go to jail and afraid he would get in trouble because the police were there, so he lied.

### First and Second Assignments of Error

{¶ 32} In his first assigned error, Finnerty argues the evidence was insufficient to convict him of GSI as the State did not present evidence that M.L. engaged in behavior that would or should have alerted him that she was asleep at the time of the incident. He notes the trial court instructed the jury that sleep could constitute a substantial impairment for purposes of R.C. 2907.05, and he also observes that this court has held that sleep, in the context of rape, can constitute a substantial impairment. He cites to *State v. Rodenberger*, 2020-Ohio-6979, ¶ 58 (6th Dist.), citing *State v. Horn*, 2018-Ohio-779, ¶ 57-58 (6th Dist.). In *Horn*, this court set forth that "'[a] jury can reasonably conclude that the defendant knew the victim was substantially impaired and unable to object to the defendant's conduct if there was evidence that the victim was in a state of deep sleep or drunkenness.'" *Id.* at ¶ 57, quoting *State v. Anderson*, 2005-Ohio-534, ¶ 41 (6th Dist.).

11.

{¶ 33} However, Finnerty asserts that the State did not present evidence that M.L. behaved in such a way that he knew or had reasonable cause to believe that she was asleep at the time of the incident. He submits M.L. testified she did not know the exact time that she fell asleep, yet she testified that she went to sleep sometime between 2:00 and 2:30 a.m., but Autumn testified that M.L. and Finnerty were still up smoking when she, Autumn, went to bed at about 2:30 - 2:45 a.m., and Nick testified that the group was still eating around 2:30 to 2:45 a.m. Finnerty further contends that M.L. admitted she sent Autumn a text at 2:56 a.m., which indicates that M.L. went to bed a short time, perhaps minutes, before she sent that text. Finnerty argues that the foregoing evidence failed to prove that he either "knew or had reasonable cause to believe" that M.L. was asleep at the time of the incident, since only a short time would have passed from when they finished smoking until they went to bed.

{¶ 34} Finnerty asserts that even if it were assumed that M.L. had been in some state of sleep, like half-asleep, drifting off to sleep, dozing or falling asleep, this court stated, in *Horn* and *Anderson*, that a jury can find substantial impairment only where an alleged victim is in *deep sleep*. In addition, Finnerty argues the State's other evidence also failed to prove that he knew or had reasonable cause to believe that M.L. was substantially impaired, due to sleep, as M.L. testified that when she woke up, she heard a voice saying, "turn over," and the context indicates that Finnerty was saying it. He insists, however, that he would not have audibly asked M.L. to "turn over" if he knew or

12.

had reasonable cause to believe that she was asleep to the degree of being substantially impaired and unable to consent to sexual conduct.

{¶ 35} In his second assigned error, Finnerty argues the weight of the evidence failed to demonstrate that M.L. was "substantially impaired because of a mental or physical condition" at the time of the incident. He submits that "substantial impairment must be established by demonstrating a present reduction, diminution or decrease in the victim's ability, either to appraise the nature of his conduct or to control his conduct," citing *State v. Zeh*, 31 Ohio St.3d 99, 103-104 (1987). "'It is sufficient for the [S]tate to establish substantial impairment by establishing a reduction or decrease in the victim's ability to act or think.' *State v. Freeman*,. . . [2011-Ohio-2663], ¶ 15 [(8th Dist.)], citing *Zeh*, at 103-04 . . .. Substantial impairment may be proven by the victim's own testimony. *State v. Franklin*, . . . 2019-Ohio-1513, ¶ 8 [(9th Dist.)]." *State v. Hovatter*, 2022-Ohio-33, ¶ 17 (6th Dist.).

{¶ 36} Finnerty observes that "M.L. testified that when she woke up, 'I remember hearing a faint "turn over"' and that '*I wake up*, and my shorts and underwear are pulled down on the lower left side of my leg and [Finnerty's] on top of me.'" (Emphasis added.) Finnerty asserts, however, that the weight of the evidence demonstrates M.L. was not in a state of "deep sleep" at the time of the incident, and the weight of the evidence failed to demonstrate that Finnerty knew, or had reasonable cause to believe, that M.L. was substantially impaired due to sleep, within the meaning of R.C. 2907.05(A)(5).

13.

**{¶ 37}** Lastly, Finnerty claims his conviction was against the manifest weight of the evidence due to his own level of intoxication, and his consumption of alcohol was a relevant factor to demonstrate that he did not know or have reasonable cause to believe M.L. was substantially impaired. No legal authority was offered in support of this claim.

## Standards of Review

**{¶ 38}** When reviewing the sufficiency of evidence, a court of appeals must consider "'whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.'" *State v. Brinkley*, 2005-Ohio-1507, ¶ 40, quoting *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus, *superseded by constitutional amendment on other grounds*. "The test for sufficiency is one of adequacy, or 'whether the evidence, if believed, can sustain the verdict as a matter of law.'" *State v. Kimble*, 2025-Ohio-310, ¶ 39 (6th Dist.), quoting *Toledo v. Manning*, 2019-Ohio-3405, ¶ 12, citing *State v. Myers*, 2018-Ohio-1903, ¶ 132.

**{¶ 39}** By contrast, when determining whether a conviction is against the manifest weight of the evidence, an appellate court must review the record, weigh the evidence and all reasonable inferences, consider the credibility of the witnesses and decide, in resolving any conflicts in the evidence, whether the trier of fact "clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *State v. Prescott*, 2010-Ohio-6048, ¶ 48 (6th Dist.), citing *State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997). When an appellate court reverses a trial

14.

court's judgment on the basis that the verdict was against the weight of the evidence, the appellate court "sits as a '"thirteenth juror"' and disagrees with the factfinder's resolution of the conflicting testimony. *Tibbs* [*v. Florida*], 457 U.S. [31,] . . . 42 [(1982)] . . ." *Thompkin*s at 387. "Although we consider the credibility of witnesses under a manifest-weight standard, we must, nonetheless, extend special deference to the fact-finder's credibility determinations, given that it is the finder of fact that has the benefit of seeing the witnesses testify, observing their facial expressions and body language, hearing their voice inflections, and discerning qualities such as hesitancy, equivocation, and candor." *State v. Brooks*, 2023-Ohio-2978, ¶ 13 (6th Dist.), citing *State v. Fell*, 2012-Ohio-616, ¶ 14 (6th Dist.).

{¶ 40} We reverse on manifest weight grounds only in the exceptional case where the evidence weighs heavily against conviction. *Thompkin*s at 387.

### Law and Analysis

{¶ 41} The elements of GSI, a violation of R.C. 2907.05(A)(5) are (1) sexual contact, (2) with another, (3) when that person's ability to resist or consent is substantially impaired by a mental or physical condition, and (4) the offender knows or has reasonable cause to believe that the other person is substantially impaired by such condition.

{¶ 42} Sexual contact "means any touching of an erogenous zone of another, including without limitation the thigh, genitals, buttock, pubic region, . . . for the purpose of sexually arousing or gratifying either person." R.C. 2907.01(B).

{¶ 43} Concerning substantial impairment, this court held, in *Rodenberger*, *Horn* and *Anderson*, as set forth above, that sleep constitutes a mental or physical condition which substantially impairs a person from resisting or consenting to sexual conduct. Other Ohio courts have also reached the same holding. *See, e.g., State v. Clark*, 2008-Ohio-3358, ¶ 21 (8th Dist.) ("When a person is asleep, he or she is not in a mental condition to resist or consent to the sexual conduct."); *State v. Graves*, 2007-Ohio-5430, ¶ 22 (8th Dist.) (The woman's "ability to resist or consent was substantially impaired because she was sleeping."); and *State v. H.H.*, 2011-Ohio-6660, ¶ 13 (10th Dist.) ("Appellant committed the crimes of forcible rape and rape of a person whose ability to resist or consent was substantially impaired due to a mental or physical condition by moving P.W. from the couch where she was sleeping to the bed, removing her clothes, and having intercourse with her while she slept. This was all part of one continuous course of action."). Substantial impairment "must be established by demonstrating a present reduction, diminution or decrease in the victim's ability, either to appraise the nature of his conduct or to control his conduct." *Zeh*, 31 Ohio St.3d at 103-104.

{¶ 44} With respect to sufficiency of the evidence, the record shows that Finnerty admitted to sexual contact with M.L., Autumn testified that M.L. told her that she, M.L., woke up from a dead sleep to Finnerty on top of her, and the bachelorette testified that M.L. shared that when she, M.L., woke up, Finnerty was on top of her. M.L.'s own testimony was that she went to bed and was "immediately out," she heard a faint voice say, "turn over" but thought she "was dreaming or imagining things," so she went back to

16.

sleep, but then woke up and Finnerty was on top of her, her shorts and underwear pulled down on the left side, above her knee, and he was squeezing her left breast while rubbing and thrusting his penis between her labia, which she did not want. Finnerty's testimony included that he did not know if M.L. was asleep or not, but he thought she was still awake even though he said nothing to her, she said nothing to him, and she did not act or react in any way to him.

{¶ 45} Viewing this evidence in a light most favorable to the prosecution, we conclude that there is sufficient evidence that Finnerty had sexual contact with M.L. while she was substantially impaired due to sleep and could not resist or consent, and Finnerty had reasonable cause to believe that M.L. was substantially impaired due to sleep.

{¶ 46} With respect to the manifest weight of the evidence, we have carefully reviewed the record, including the transcript of the trial testimony. The State and Finnerty presented somewhat conflicting testimony, as Finnerty testified that he did not know if M.L. was asleep, but he thought she was awake when he touched her breast and masturbated and he also thought that she wanted him to do so, while M.L. testified she was asleep and she did not want the sexual contact by Finnerty.

{¶ 47} After reviewing the evidence introduced at trial, we cannot say that the verdict was against the manifest weight of the evidence, simply because the jury chose to believe the testimony of the prosecution's witnesses and not Finnerty's testimony. As

17.

such, we fail to find any suggestion that the jury lost its way or that an injustice occurred. Accordingly, Finnerty's first and second assignments of error are not well-taken.

**Third Assignment of Error**

{¶ 48} Finnerty argues the trial court abused its discretion in allowing the State to introduce into evidence, over his objection, the letter he wrote to the judge, as the letter was not admissible under Evid.R. 403(A) because any alleged probative value was substantially outweighed by the danger of unfair prejudice to Finnerty. Evid.R. 403(A) states that "[a]though relevant, evidence is not admissible if its probative value is substantially outweighed by the danger of unfair prejudice . . ."

{¶ 49} Finnerty claims the passage of the letter in which he refers to "my victim" is particularly unfairly prejudicial because even though he did not mention M.L. by name or describe in detail what allegedly occurred, the context strongly implies that he was referring to M.L. as a victim. He asserts that a reasonable juror, hearing the passage in the context of what had taken place, combined with Finnerty's testimony in his own defense, would have taken it as an admission of guilt on Finnerty's part and that he was acknowledging that the victim in the letter, likely M.L., was a victim of something. This would have unfairly led jurors to believe that Finnerty was confessing to the charged offenses, despite Finnerty's testimony wherein he denied that he raped M.L.

{¶ 50} Finnerty contends the letter purportedly states, in pertinent part:

[N]ow my drinking has caused problems I would have never saw coming. I very much regret the things that took place last August. If I could

apologize to my victim, I would in a heartbeat. I would tell her how deeply sorry, full of remorse and regret I am.

{¶ 51} Finnerty submits there was no probative value in the letter since nothing in the letter helped the jury determine what happened during the incident, and the letter's only relevance was to determine his subjective state of mind at the time he wrote it, and not at the time of the alleged offenses. Therefore, Finnerty insists the trial court abused its discretion and violated Evid.R. 403(A) in allowing the letter to be admitted into evidence.

{¶ 52} Finnerty also argues the trial court's admission of the letter into evidence, over the defense's objection, violated his right to due process as he was severely and unfairly prejudiced. He asserts jurors would have heard the letter, concluded he "confessed" to all of the charged offenses, and decided to convict him of GSI as a sort of "compromise" between a full acquittal and convicting him of all three charges.

**Standard of Review**

{¶ 53} "[T]he admission of evidence lies within the broad discretion of the trial court, and a reviewing court should not disturb evidentiary decisions in the absence of an abuse of discretion that has created material prejudice." *State v. Conway*, 2006-Ohio-2815, ¶ 62, citing *State v. Issa*, 93 Ohio St.3d 49, 64 (2001). Abuse of discretion means that the trial court's decision was unreasonable, arbitrary, or unconscionable. *State ex rel. Askew v. Goldhart*, 75 Ohio St.3d 608, 610 (1996).

## Law and Analysis

{¶ 54} When deciding the admissibility of evidence under Evid.R. 403(A), a trial court must engage in a balancing test to determine whether the probative value of the evidence outweighs its prejudicial effect. *State v. Maurer*, 15 Ohio St.3d 239 (1984), paragraph seven of the syllabus. For the evidence to be deemed inadmissible under Evid.R. 403, the evidence's "probative value must be minimal and the prejudice great." *State v. Morales*, 32 Ohio St.3d 252, 258 (1987). "[R]elevant evidence, challenged as being outweighed by its prejudicial effects, should be viewed in a light most favorable to the proponent of the evidence, maximizing its probative value and minimizing any prejudicial effect to one opposing admission." *Maurer* at 265.

{¶ 55} The Supreme Court of Ohio has observed that all relevant evidence is prejudicial, because "evidence that tends to disprove a party's rendition of the facts necessarily harms that party's case." *State v. Crotts*, 2004-Ohio-6550, ¶ 23. However, the court stressed that "only evidence that is unfairly prejudicial is excludable." *Id.* Unfair prejudice refers to evidence which tends to suggest an improper basis for a decision. *State v. Lang*, 2011-Ohio-4215, ¶ 89. If evidence "'arouses the jury's emotional sympathies, evokes a sense of horror, or appeals to an instinct to punish, the evidence may be unfairly prejudicial. Usually, although not always, unfairly prejudicial evidence appeals to the jury's emotions rather than intellect.' Weissenberger's Ohio Evidence (2000) 85-87, Section 403.3." *Oberlin v. Akron Gen. Med. Ctr.*, 91 Ohio St.3d 169, 172 (2001).

{¶ 56} In *State v. Copley*, 2005-Ohio-896, ¶ 30, 33 (10th Dist.), the Tenth District Court of Appeals found the trial court properly admitted the defendant's notepad with rap lyrics which pertained to the victim's death, and the probative value of the lyrics was not substantially outweighed by unfair prejudice, since the lyrics "vividly describe[d] the shooting" and were "nothing more than [the defendant's] own version of events surrounding the shooting"  The court of appeals also determined that "aspects of the lyrics rebut [the defendant's] self-defense claim." *Id.* at ¶ 30.

{¶ 57} Upon review, applying the foregoing principles to the letter Finnerty wrote to the trial court judge, we find that the probative value of the letter was not substantially outweighed by the danger of unfair prejudice.  The State, in presenting the letter, sought to present information which can be viewed as highly probative since it lends credence to the State's claim that Finnerty sexually assaulted M.L.  Also, the letter's information, if believed, could cast doubt upon Finnerty's credibility and the veracity of his testimony.  Moreover, the information Finnerty shared with the trial court in his letter may allow jurors to draw a logical conclusion that because Finnerty regrets his actions and wishes to apologize to the victim, he might not have been truthful when he alleged that M.L. was awake and a consenting party to sexual activity with him.   Although the information may prejudice Finnerty's position that the sexual contact was consensual, he blames his actions on his drinking, which we find does not attempt to arouse the jury's sympathies, evoke a sense of horror, or appeal to an instinct to punish.  Rather, the information, in part, provided the reason for Finnerty's actions surrounding the incident.  We therefore

21.

find that the trial court did not abuse its discretion when it admitted the letter authored by Finnerty into evidence. Furthermore, any error committed in admitting the letter was harmless because sufficient evidence existed, which if believed, would convince the average mind of Finnerty's guilt beyond a reasonable doubt. *See State v. Zimmerman,* 18 Ohio St.3d 43, 45 (1985).

{¶ 58} With regard to the assertions offered by Finnerty in support of due process violation claim, we find that these assertions are based on speculation, not on evidence in the record. Claims based on mere speculation will be rejected. *See State v. Hale*, 2008-Ohio-3426, ¶ 102; *State v. McKnight*, 2005-Ohio-6046, ¶ 234.

{¶ 59} Based on the foregoing, we find Finnerty's third assignment of error not well-taken.

## Fourth Assignment of Error

{¶ 60} Finnerty argues the trial court committed plain error when it ordered him to pay $1,855.48 in restitution to M.L. He asserts the restitution order violates his due process right under the Fourteenth Amendment to the United States Constitution and Article I, Section 16 of the Ohio Constitution. He contends the trial court did not consider his present or future ability to pay restitution, as neither the PSI nor the record mention his present or future ability to pay. He also claims the PSI did not include any reasons for the specific amount of restitution ordered. Finnerty concedes that he did not object to the restitution order at the time of his sentencing.

22.

**Standard of Review**

{¶ 61} Typically, the standard of review for analyzing a restitution order as a part of a felony sentence is to determine if the sentence complies with R.C. 2953.08(G)(2)(b). *State v. Manning*, 2025-Ohio-3101, ¶ 11 (6th Dist.). However, the failure of a defendant to object to a trial court's restitution order constitutes a waiver of all but plain error. *State v. Griffin*, 2013-Ohio-411, ¶ 43 (6th Dist.). "Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court." Crim.R. 52(B). To demonstrate plain error, there must be a showing "that an error occurred, that the error was obvious, and that there is a reasonable probability that the error resulted in prejudice, meaning that the error affected the outcome . . ." *State v. Echols*, 2024-Ohio-5088, ¶ 50, citing *State v. Knuff*, 2024-Ohio-902, ¶ 117. "Notice of plain error under Crim.R. 52(B) is to be taken with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice." *State v. Long*, 53 Ohio St.2d 91 (1978), paragraph three of the syllabus.

**Law**

{¶ 62} R.C. 2929.18(A)(1) authorizes the trial court to order an offender pay restitution to a victim in an amount based upon the victim's economic loss. "A court is generally required to consider a defendant's 'present and future ability to pay . . .' before imposing a financial sanction permitted by R.C. 2929.18, including restitution. R.C. 2929.19(B)(5)." *State v. Eames*, 2024-Ohio-183, ¶ 20 (6th Dist.). A trial court is only required to conduct a hearing on restitution if the amount of restitution is in dispute.

23.

*State v. Allen*, 2021-Ohio-4398, ¶ 22 (6th Dist.), citing *State v. Lalain*, 2013-Ohio-3093, paragraph two of the syllabus. Even if a hearing is not required, the record must still contain evidence that the trial court considered an offender's ability to pay the restitution order. *State v. Leveck*, 2021-Ohio-1547, ¶ 16 (6th Dist.). A trial court does not have to make an express finding regarding an offender's ability to pay so long as the record indicates that the trial court considered the PSI, which included financial, educational, and vocational information when determining the offender's sentence. *Id.* at ¶ 17.

### Analysis

{¶ 63} Upon review, prior to sentencing, Finnerty was referred for a PSI, which contained information about Finnerty's personal and educational background, physical and mental health, residence, family and employment history, including that he was employed full-time at the same company since April 2014, and his position was being held until he could return to work.

{¶ 64} The transcript of the sentencing hearing is not included in the appellate record. It is the duty of the appellant to provide a transcript for appellate review since the appellant bears the burden of showing error by referring to matters in the record. *Knapp v. Edwards Laboratories*, 61 Ohio St.2d 197, 199 (1980). "When portions of the transcript necessary for resolution of assigned errors are omitted from the record, the reviewing court has nothing to pass upon and thus, as to those assigned errors, the court has no choice but to presume the validity of the lower court's proceedings, and affirm." *Id.*

24.

{¶ 65} Although the sentencing hearing transcript is not a part of the record, the trial court's sentencing judgment entry is in the record and it reveals that the trial court represented that it considered the record, oral statements, victim impact statements and the PSI prior to imposing sentence, including the restitution order.

{¶ 66} We find that record demonstrates that the trial court considered Finnerty's present and future ability to pay, and hence, we find no plain error in the order for restitution. Accordingly, Finnerty's fourth assignment of error is not well-taken.

{¶ 67} The judgment of the Ottawa County Court of Common Pleas is affirmed. Finnerty is ordered to pay the costs of this appeal, pursuant to App.R. 24.

Judgment affirmed.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.

Thomas J. Osowik, J.
_____
JUDGE

Myron C. Duhart, J.
_____
JUDGE

Charles E. Sulek, P.J.
CONCUR.
_____
JUDGE

This decision is subject to further editing by the Supreme Court of Ohio's Reporter of Decisions. Parties interested in viewing the final reported version are advised to visit the Ohio Supreme Court's web site at: http://www.supremecourt.ohio.gov/ROD/docs/.

25.